# THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### ANDERSON DIVISION

| | |
|---|---|
| **Society for Crippled Children;** | **Case Number:** |
|      **Grady O. Snipes; and numerous other purchasers of subordinated notes of The Thaxton Group, Inc. and their successors, heirs and assigns;** | **8: 06-_____** |

     including:

     **Wayne H. Ault;  William Cox for Greater Frazier AME Zion Church; Sherry Allgood;  Harold and B.J. Alicie  PR of the Estate of Joe Alicie;  Aladdin Drum and Bugle Corps;  Harold T. Alicie;  Kathleen H. Adams; Jacqueline Arant  P/N/G of Ryan T. Arant;  John H. Adams;  Cornelia R. Adams;  Betty C. Arant;  Roberta M. Aylesworth;  Charles Armendinger;  Beatrice V. Allensworth;  Laura A. Adams;  John E. Adams; George E. Adams;  Sam Anderson;  Avery R. Adkins; Carol P. Adams PR of the Estate of Charles P. Adams; Geraldine E. Atkinson;  Phyllis G. Atkinson;  Krista Axline;  Amanda L. Axline;  Ruby J. Armendinger; Marilyn E. Alberts;  Gladys E. Autry;  Richard Autry Sr.;  Tommy M. Arrowood;  Tommy V. Arrowood; John Antjas;  Peter Antjas;  Thomas E. Azbell;  D. Neel Awwiller;  Peggy Adkins P/N/G of Trevor M. Adkins; Peggy Adkins;  Peggy Adkins P/N/G of Mindy Sue Adkins;  Thomas Elige Allen;  Kristen N. Allen;  Janet L. Allen;  Avery Adkins;  Ronald G. Augenstein; Jeanette Anderson;  Willie Abney;  James D. Anderson; Kathleen Ackley;  Ronald B. Anderson;  Willard H. Allred;  Adler Construction Co., Inc.;  Connie L. Ashley; John W. Allen;  Sean J. Ahern;  Henry W. Anderson; James F. Anderson;  Derek N. Appleton;  William Askins;  Lyndia Jane Armstrong;  Leann S. Abernathy; George E. Andrew;  Vira L. Abernathy;  Raymond J. Adamski;  Warren E. Adams;  Dana H. Alexander; Sandra F. Anderson;  Margaret Jo Taylor;  Betty J. Arant;  Kiersten E. Anderson;  Kathy J. Atkinson; Renee M. Bohn;  Progressive Church of our Lord Jesus Christ;  Sue E. Barker;  William S. Boan;  Bonnie Berger;  Olivia Britton;  Jordan Britton;  Offie Bartley;**

Harold Winburn and Arlon Winburn PR of the estate of Azilee F. Byrd;  Garren Brent Brewer PR of the estate of Claude Wilson Brewer Jr.;  Mary Eloise Brewer Bartell;  Chad A Biegler;  Ellen J. Biegler;  Sara B. Bowers;  Joe R. Bailey;  Marcene F. Bailey;  Donald L. Blackmon;  Betsy Williams Brewer;  Naydeen P. Byerly;  Ralph E. Bolen;  Jane J. Burch;  Deborah H. Belk;  Pamela J. Blumenschein;  Robert E. Borden;  Kimberly A Brown;  Eunice Blackwell;  Erline Boltz P.R. of the Estate of Harley Boltz;  Doris Baker;  April C. Benton Reed;  Billy Baker;  Rose Marie Baker;  William J. Bowers;  David L. Brigman;  Judith Bogart;  William T. Bennett;  William G. Barnhart;  Balcom Family Tst;  Patricia Ann Blumenschein;  Ewald Blumenschein;  Donald R. Black;  Carroll Biggs;  Randy L. Brenneman;  George D. Bosten;  D. David Bumpus;  Jane I. Bevington;  Jerry H. Broughton;  Wilfred W. Buck;  David A. Baker;  F. Shirley Baldauf;    Ed Baldauf;  James H. Bull;  Blaine E. Brenneman;  Romano Boz;  Robert R. Bennett Jr.;  Genevieve P. Bennett;  William L. Bechtold;  Justin Ryan Baker;  David W. Bowers;  Donald W. Barrick;  Dan A. Brock;  Charles E. Bechtol;  William E. Brown;  David L. Blair;  Marjorie u. Brundage;  Baluck Family Tst;  Elmer E. Beatty;  Patricia P. Beilfuss;  Tammy Burr;  Mary C. Boyd;  Christin Brooks;  Mary M Brown;  Roy H. Boyd, Jr ;  Joyce Burns;  Aubrey Burns;  Homer Bethea;  Joseph Kelvin Berry;  Joshua D. Bowers;  Betty M. Bailey;  Harold Brewster;  James Blakely;  Frances M. Blakely;  Antonius P. Badoux;  Rebecca A. Burkhardt;  Antonius P. Badoux, Trustee;  Financial Investors Resource Mgmt.;  Ronald J. Biggers;  Carl Baker ;  Charlotte W. Barnett;  Roy Brewington;  Philip A. Bowie;  Richard T Beach II;  Samuel David Bare Foot;  Linda R Beekman;  Esther Mae Baker;  Eva Blankenship;  Lacy Blankenship;  John T Boyd;  Ted Burris;  Larry R. Beekman;  William A. Barrett;  Russell Berry;  Scott gru-Bell;  Larry K. Brady;  Mary H. Brady;  David A. Baker;  Vickie D. Buckner;  Robert C. Bair;  Janelle S. Barrett;  Faye P. Bowers;  Robin Boone;  Mary Elaine C. Boyce;  Pamela E. Berberich;  Ronald L. Booth;  Judith A. Booth;  Pauline S. Broyles;  Sharon R. Barnhart;  Richard Barnhart;  Lloyd Boone;  Amy Barrett;  Gloria Blevins;  Wanda S. Bilbrey P.R. of

the Estate of Robert G. Bilbrey;  Renee Bacak;  William
H. Bridges;  James H. Belk Jr.;  Betty J. Bugh P.R. of the
Estate of Charles Bugh;  Monnie Blanton;  William
Henry Blythe;  Larry M. Brice;  William Mark Brice;
Madeline M. Brice;  Joey Bevacqua;  Alicia Brice
Bevacqua;  Stephen W. Barrett;  April M. Barrett;
Stephanie Brewer;  Wayne H. Bradley;  Catherine
Cheek;  Sharon S. Clark;  Joellen E. McCroan;  Margie
F. Catoe PR of the Estate of Ferris L. Catoe;  Ms.
Margie F. Catoe;  Samuel Crowe;  FT Carnes;  Patricia
Dix Casillas;  John W. Callahan;  Elizabeth S. Callahan;
Barbara L. Cash;  Frank J. Carone;  John S. O'Connor;
William W. Cahoon;  Anton CT Chin;  Charles
Caywood;  Cornelia R. Cavanaugh;  Thomas W.
Cavanaugh;  Flossie M. Van Duslen;  Carl E. Cameron;
Robert R. Corcoran;  Janice G. Clark and Samuel L.
Mizer P.R. of the Estate of Lois J. Mizer;  Marilyn J.
Cox, Treasurer for Coshocton Chapter #157 O.E.S.;
Donald Crunkilton;  Julia B. Collins, P.R. of the Estate
of R. H. Collins;  Herman H. Cooper and Lois J. Cooper
Living Trust;  Eddie F. Gordon for the City of Monroe
Firemen Relief Fund;  Doyle E. Clay;  Joyce Cooper;
Margaret T. Capell;  Herbert C. Coil;  Louise Coil;
June C. Carpenter;  Larry A. Carpenter;  Horace N.
Clark;  Gail Clark;  Robin Lane Cooke P.R. of the
Estate of Joe Cooke, Jr.;  Laurence E. Cocherl;  John A.
Cramer;  Karla K. Chandler;  Yvonne Carnes;  Don
Sinclair Treasurer of Catawba Baptist Church;  Wallace
P. Cash;  Woodrow D. Crock;  Gloria M. Crowell;  Jerry
Cooley;  William R. Crimminger;  Patricia A.
Courtright;  Helen D. Conner for the Conner Family
Trust;  Esther H. Champion;  Mona Crawford;  Robert
C. Collins;  Janet E. Crockett;  Kevin Crockett;  Lews
W. Crockett;  Patricia Curl;  M. Janette Covington;
Donna P. Cassidy;  Jimmy C. Cassidy;  Mervin E.
Cramer;  Lawrence Comer;  Billy J. Cantrell;  Walter
Cannaday;  Poe Carawan;  Albert G. Cloud;  C. I.
Coleman;  Melissa G. Coleman;  Sara H. Cox by Patricia
C. Munn P.O.A;  Jodi L. Carpenter;  Muriel A. Cave;
Deland B. Covington Sr.;  Louise F. Covington. Lucy C.
Cox;  Heather E. Comer;  Geo Thomas Clouse;
Meredith V. Comer;  Jerry H. Corwin;  Bruce W.
Charles;  Buck Wayne Crouch;  Lemuel Crawford;

Robert F. Coleman;  Caronell G. Caldwell;  Samuel Crowe;  James A. Cunningham;  Elizabeth B. Cunningham;  Mary W. Camp;  Ralph A. Cope;  Roy F. Chason;  Wilbert L. Crockett;  John C. Cato;  Mathew r. Coleman;  Bobby E. Corn;  Jytte Conradsen;  Jo Ann C. Cox;  Donald Conradsen;  Parks Cox;  Iris C. Coleman;  Curt E. Campbell;  Roy W. Campbell;  Charles M. Crawford;  Julia F. Corn;  William Cox for Genesis II Inc.;  William Cox;  Irene J. Carter;  Mary Elizabeth Cameron;  Jackie F. Caldwell;  Valorie J. Crawford;  Bonnie Cody for Tri-Star Solutions Inc.;  Guy F. Cory;  Winnie J. Cheek P.R. of the Estate of Howard B. Cheek;  Bonnie Cody;  Jerry C. Carnes;  Alfred T. Dietrich;  Lisa Dover;  Max H. Dostar;  Terrence Demeter;  Addie M. Davis;  Alger K. Douglas President for Salem/Pageland Presbyterian Church;  Vincent Delaidatti;  Phyllis Hoffman P/N/G of Gunner Daniel;  Katherine H. Dalton;  Dwaine R. Doup;  Joseph R. Doelker;  F.J. Denise;  Dale A. Daily;  Drexel Darr;  June L. Daum;  Noble E. Demoss;  Hattie Driggers for Dylan C. Driggers;  Barbara K. Dipietro;  Herbert Day;  Day Family Trust;  Betty M. Deese;  G.W. Dawkins;  Alice C. Doup;  Charles E. Delong;  David E. Darner;  Frances M. Dawkins;  Anna Lou Darner;  Mary R. Defenbaugh;  Ann J. Dulin;  Margaret R. Davis;  Nancy Darlene DiCola;  Darlene DiCola for Anthony J. Gray;  Dan Dolan;  Nancy K. Dreyer;  Theodore A. Deppner;  Steve Dalton;  Etta D. Dowey;  Henry F. Dowey;  Todd A. Dettling;  Jean B. Dabney;  Donald P. Dabney;  Edsel Dotson;  Garnetta Sue Davis;  Margaret C. Dart;  Michael L. Darling;  UN OK Darling;  Pattsy Dotson;  John B. Devinney, Sr.;  Patrick J. Doyle; Barbara J. Demorest;  Lawrence Dinkins;  Bessie Dye;  Cannon Daniel;  John A. Dennis;  Grant K. Daughetty;  Betty S. Doster;  Peggy A. Daughtery;  James H. Daughtery;  Grace R. Emonds;  Maxine Ewing P.R. of the Estate of Jacob Ewing;  James M. Evans;  Alphues D. Evans;  Robert Burrell Emmons;  Haley A. Evans;  Tony Elvington;  Elizabeth Estrada;  Nathan B. Evans;  Etolia M. Elledge;  Bill Elledge Jr.;  Billy Eddins;  Darlene s. Elliott;  Thomas D. Eirich;  Joseph J. Erdy;  Marvin Estep;  Theresa F. Elder;  Alice C. Ellis;  Daryl V. Ellis;  Patricia L. Eatman;  Gary E. Evatt;  James M. Evans;  Alphues D. Evans;  Donald L. Evans;  Marietta G.

Everhart;  Robert C. Eickemeyer;  Joan Marie Elliot;
Rachel D. Funderburk;  Barbara A. Fant;  Donald T.
Faile;  Billy R. Faulkner;  Caroline Lose-Frahn;  Ashley
Lose-Frahn, UTMA;  Hanna Lose-Frahn Jeffrey E.
Fetters;  Kim K. Frahn;  Linda S. Fate;  Elizabeth P.
Faulkenberry;  Larry J. Fox;  Kurt Friehauf;  Edward
Coke Faulkenberry P.R. of the Estate of Sara B.
Faulkenberry;  Dale W. Foster;  Maxine D. Foster;
Elvera Wheeler Fox;  Darrell J. Funderburk;  Mildred
M. Faile;  Ida M. Farahay;  Mildred M. Faile;  Dorothy
C. Friscia;  Ruth H. Fagan;  Richard H. Frank;  Richard
Mark Ferguson;  Clayton L. Frasher;  Dorcas M.
Frasher;  Claire W. Fleming;  Charles A. Floyd;  Ruby
B. Faulkenberry;  Steve K. Fagan;  Eric Spencer Fryt;
Carroll Faile;  Janie E. Faile;  Henry Lee Furr;  Henry
Lee Furr for Lake Shore Estates, Inc.;  Sarah Lee
Funderburke;  Yvonne Finger;  Marvin J. Goldman;
Johnie Goldman;  Linda A. Zink PR of the Estate of
Lucile E. Gasser;  Catherine O. Garrison by Carole B.
Gilland, POA;  Faye G. Griffin;  Faye Shannon Griffin;
Phillip D. Grant;  Thomas B. Greenslade, Jr. Susan L.
Gingerich;  Cheri Grant;  Marjorie P. Green;  Russell
Kyle Gaddy P/N/G Debbie Russell Gaddy;  Sonia B.
Greenslade;  Miriam Grant P.R. of the Estate of Jerry
Grant;  William M. Gleich;  Patricia M. Gilmer;  Ethel
Graves;  Jerry R. Greene;  Sherri L. Greene;  Ellen B.
Greene;  Wally A. Gilmer;  Joann J. Griffin;  Dan
Gordon and Gloria Gordon;  Diane Gottschalk;  Betty C.
Garrison;  Vera J. Girod;  David L. Goodwin;  Joyce
Cooper P/N/G of James Conner Grant;  Raymond A.
Gross;  Nancy J. Groves;  Minnie Mae Gulledge;
William Gorton President for Gorton Farms Inc.;
Robert L. Guillotte;  Charles Goodwin;  Helen M.
Gillogly;  Dwaine Grant;  Shawne Geyer;  Alice T.
Gardner;  Elizabeth S. Gordon P/N/G of Thomas I.
Gordon;  Jason S. Garver;  Jason S. Garver Guardion
for Greyson Garver;  Frank Griffith;  Thomas J.
Goodenow;  Lois J. Gruenbaum;  Beaufort D. Graham;
Jeff D. Gilmore;  Kris A. Goeiling;  Gene B. Grace;
David C. Gardner, Jr.;  Olin H. Goff;  Cecil Graham;
Donald Gaddy;  Keith Gillespie;  Mary L. Gulledge;
Elizabeth L. Glasscock P.R. of the Estate of John E.
Glasscock;  James C. Gaddy;  Russell Ga tchell;  Carol
D. Gillespie;  Vickie F. Gulledge;  Michael J. Garber;

Robert J. Gordon;  Richard A. Galloway;  William H. Gilbert;  Harrell E. Graham;  Ken A. Guss;  Brenda L. Garver;  Robert G. Garrison;  Albert Guilherme;  P. Thomas Goodale;  Gabrielle Grubic;  Timothy Grubic;  David C. Green;  Elizabeth Hutchinson;  William J. Hollins;  George Heelan;  Morris Lamar Hicks P.R. of the Estate of Creda Hicks;  Julia R. Hardwick;  Joe M. Harris;  Wade I. Hunter;  Doris Y. Hunter;  Donald T. Hunter;  Marcia V. Hunter Haynes;  Julius F. Hall;  Dewey C. Hickman;  Rita J. Heiby;  Debra A. Hammond;  Zachary Hammond;  Ralph E. Hammond;  Robert L. Hammond;  Mark J. Hamann;  Lorene M. Hamann;  Virgie M. Hinson;  Rosanna Henry-Alig;  Laurel V. Hutchinson;  Bliss Harlan;  Larry Harlan;  Verba J. Hostetler;  Elaine G. Hutson;  Lawrence R. Henry;  Mary Jo Hipp;  Jean A. Harper;  Andrell W. Harper;  Kenneth H. Harmon;  J. Richard Harris;  Richard L Hoover;  Sue F. Harper;  Woodrow W. Huff;  Abbagail Huff;  Lorraine T. Harper;  Margaret A. Hukill, Trustee;  Franklin D. Hallman;  Pamela Ann Hurd;  Julia E. Horton;  Kathy Harpe P/N/G of Karley Harpe;  Jay Haycook;  Dianna Haycook;  Martha L. Hostetler;  Tracy K. Hughes;  Eve W. Hush;  Mose J. Hostetler;  Georgia Helmick;  Esta M. Huffman;  Martin H. Helmick;  Opal Hurd;  Earl E. Hassler;  Hali Huge;  Dorothy A. Hoersten;  Maxie G. Hinson;  Mary E. Hodge;  Oscar R. Horton;  Amy Helmick;  Jean Lee Herb;  Elaine Grant P.R. of the Estate of Marie E. Horn;  Dixie Harmon P/N/G of Angela Langley;  Dixie Harmon;  Troy M. Harper;  Kathleen H. Hamilton;  Bobby O. Howard;  Elizabeth J. Howard;  Janice E. Hill;  Geraldine M. Hossenlopp;  Elleen S. Huff;  Robert G. Hancock;  John R. Hankins;  Linda L. Hall;  Wayne P. Harman;  Nelson L. Hall;  Garry L. Hill;  Alvin V. Hooper;  Linda G. Huggins;  Ruby Hamm;  Wilma S. Harmon;  Harold H. Hixson, Jr.;  Jack L. Heath;  Jackie M. Horton;  Polly G. Haigler;  Adell H. Hearon;  John L. Hutson;  John L. Hutson for Coshocton Council #110;  John L. Hutson for Coshocton Commandery #63;  John L. Hutson;  John L. Hutson for Samoritan Chapter #50;  John L. Hutson for Masonie Temple Company;  Susan W. Harris;  H. Thomas Hicks;  Avin L. Hunter;  Arleen L. Herrick;  Donna Horn;  Lester L. Hack;  Gary Hill;  William A. Coyer;  Zachary Hennessee;  James G. Hale;

Marjean Hickerson; Alyssa Hennessee; E.M. Horton, Jr; Kim Hagans; Larry Hicks for The Investors Club; Ronald G Hinson for Hinson Electric, Inc.; George Hagans; Walter Hines; Dale E. Hilkert; John Hudepohl; Jo-Anne L. Hall; Melvin B. Howard; Katherine H. Howard; Kenneth L. Holder; Connie L. Herd; Sarah Jane Harris for The Harris Family Trust; Jack Hatfield; Bobby G. Hall; Louise Hall; Fay J. Hinson; Robert S. Hathaway; Patricia J. Hassler; Frances L. Halley; Marie B. Hinson; Oscar F. Hartman; Donald G. Haberman and Donna L. Haberman; EuniceV. Haithcock; Olin T. Hodge; Dana H. Alexandra P/N/G of Christopher Adam Hancock; William A. Hersher; Edward M. Ingram; Olivia Marie Ihm; Samantha Rae Ihm; Holger Ihm; George A. Schwap, Treasurer for Independant Insurance Agents of York County; Barbara E. Igo; B.R. Jackie Isgett; Marilyn Joan Johnson PR of the Estate of Ralph E. Johnson; Marilyn Joan Johnson; Gary W. Jones; Therald F. Jackson; Mark Johnson; Judy A. Jackson; Smith Barney Citigroup, Custodian for Judy Jackson, IRA; Glenn E. Jackson; William H. Josleyn; Dorothy Josleyn; Kenneth E. Jones; Doris M. Jones; Glenn E. Jones; Norma O. Jacob; Faye R. James; Jerry S. Joyner; Fleet W. Jones, Jr. Zelma U. Jones; S.R. Johnson; Norman J. Joyner; Marylen S. Jackson; David E. Jackson; Susan B. Jackson; Pamela J Jones; Wanda Johnson; Gary Hill P.R. of the Estate of Dorothy V. Hull; Debra Jenkins; Perry M. Jenkins; Evan H. Jones; Bobby L. Jordon P/N/G Alyssa McManus; Floyd L. Jackson; Floyd L. Jackson; Timothy L. Jackson; James F. Johnson; Frank T. Johnson IV; Paul R. Jennings; Danny Orr Jackson; Casey A. Jackson; Ida R. Johnson; Robert A. Jackson; Johnnie W. Jones; Gunter Jonekeit; Jack C. Johnson; Janice E. Jewett; Robert M. Jewett; Micheal Jewett; Bobby L. Knight, Sr.; Norma H. Krouse; Peggy D. Knight; William D. Knight; Claude W. Kirkley; Brad Kirkley; Tom Keller; John B. Kelly; William O. Knight; Matyas Krim; Mary Lou Kauffman; Alvin S. Kauffman; Betty J. Knight; J. Fredrick Kleiber; Herbert Kleiber; Alfreda Kleiber; Bobby L. Knight, Jr. Eula E. Kinny; Kenneth Kleiber; Roger Dale Knight; Wayne Kleiber; Brooklyn Kleiber; David G. Knight; Anna B. Kleiber,

Trustee;  Robert P. King;  Donovan L. Klinger;  Mary
Ann Kunak;  Joseph B. Kirker;  Jeanette Salter Kibler;
Johanna Keiser;  Bruce Keiser;  Robert A. Knickel;
Helen Lorene King;  Paul E. Kennington;  Sheila M.
Knight;  Kay Elaine Kready;  Paul Kready;  Frances
Kleiber;  John W. Knight, Sr. Carl Kuhns;  Richard E.
Klein;  Kathy Kirkley;  Harold N. Kirkland;  Patricia
Lynn Jeffers Karr;  Glenn F. Kiker;  Annis F. Kiker;
Clarice Kost;  H Thomas Lamb;  O. William Lilva;  O.
William Lilja;  Marjorie B. Lilja;  Joyce Logan;
Rondeau G. Laffitte, Jr. Melissa S. Lamb;  Ann E.
Lowery;  Tommy D. Langley;  Tony Lenzo;  Dennis E.
Lisenby;  Loster L. Love;  George Lane;  George Lewis;
Janet L. Levering;  Lois M. Long;  Frank W. Laney;
Sarah C. Lee;  Candace L. Laymon;  Moses Lee, Jr.;
Joyce Lobo;  Rita Lancaster;  Kenneth W. Lambert;
Leslie Fire Department, George A. Schwab, Treasurer;
Mary C. Lumbardo;  Irving Linet;  Sheila W. Love for
Travis C. Love;  Sheila W. Love for Roger C.Love;
Kathleen M. Lang;  Lynn L. Love;  Bertha Little;  Barry
J. Lynn;  Ricky Edward Lynch;  Wade M. Lambert;
Eltea Lambert;  Roberta L. Loy;  Ethel G. Lisenby;
David L. Lint;  Wanda S. Latham;  Alvin A. Leaird;  Lee
E. Lydie;  Jacob Daniel Lisenby;  Denise H. Lisenby
P/N/G/ of Victoria Beth Lisenby;  Dennis E. Lisenby;
Jeff Lowry;  Ronald D. Lilly;  Wayne D. Lamp;  Debra
Lynn Lamp;  Charlotte J. Loren;  Carol W. Lee;  Barry
J. Lentz;  Ivon J. Loos;  Barbara S. Lewis;  Charles
Link;  Janet Lantz;  Leonard E. Leedy;  Sheri S. Laney;
Doris D. Laney;  William G. Laney;  Elvira Logan;
Nancy S. Lowery;  Patti B. Lemmond;  Rebecca A.
Moder;  Jimmie R. Moder;  James M. Miller;  Lisa
Morton;  Ljane K. Mason;  Warden K. Miller;  Bradley
R. Moore;  M. Gregg Marshall;  Joe F. McCollum;
Rogenia Motley;  Kenneth B. Medlin;  Garrison Motley;
Carol W. Marshall;  Clarence L. Marshall;  William
Lewis Marshall;  Joseph Mosley;  Gerald W. Mackey;
Marion L. Mackey;  Conrad Weidman, Treasurer for
M.H.S. Scholarship Foundation;  Abby Mellon;  Saretta
C. Mitchell;  Chuck Melick;  Norma J. Magers;  Alex
Mathews;  Kristin Mathews;  Michael Mathews;  Samuel
L. Mizer;  Lorrie A. Valentine;  Bobby L. Mills P.R. of
the Estate of Martha Mills;  W.F. McBride;  Deborah
Lee Montelongo;  Dorothy J. Matheny;  Thomas

McNally;  Thomas Manus, Jr.;  Georgeana Miller;  Paul
D. McCarty;  Johnnie W. Miller;  Alice C. Morrison;
Martha McCray (Green);  Carole A. Markle;  Frances
M. Marsh;  Bette Magers;  Jerry O. Melton;  James D.
Melton;  W.F. McBride III;  James D. Mangum;
Charles A. Mincey;  Gordon A. MacDonald;  Jerry F.
McDaniel;  Carl G. Moody;  Robert D. Moore;  Charles
O. Middleton;  Eloise A. Moree;  Max R. McCormick;
Kenneth L. Mitchell;  Willene P. Marks;  Terry L.
Merillat;  Donald L. Meredith;  L.J.Morrow;  Carl L.
Morrow;  Katheryn Muether;  Nalonnie Moore;
Geraldine C. McAlister;  Lucille McCroan;  Charles
Edwin Moore;  Alice S. Moore;  David C. Moore;  Mary
Myser;  William C. Meyers;  Charlotte Ann McCreary;
Alvin Leaird for Mt Moriah Lodge #58;  Juanita J.
Mungo;  Varnon McCrorey P/N/G for Joshua
McCrorey;  Mary K. Mason;  Ailene B. Meek;  Virginia
R. Miller;  David M. McCreary;  Teresa McCreary;
William J. Muether;  Sandra Mozingo;  William F.
Mozingo;  Thomas D. Moshier;  Patsy M. Morrison;
Lisa H. Mills;  Billy P. McSwain;  Brenda C. Moody;
Hildred Marshall;  Marre E. Manion;  James H.
Marlowe;  Beverly Marshall;  Jocelyn B. McKee;
Cathryn B. Mayton;  David B. McSwain;  Jacqueline D.
Moore;  Sherrill C. Mullis;  Robert C. Massa;  Charles
L. Moss;  Grace Joan McCarty PR of Estate of Roberty
McCarty;  Steve L. Mason;  Vivian A. Matthews;  Jack
Moore;  Nancy Moore;  William H. McCoy;  Robert H.
McDowell;  James H. Morris;  Doris J. Morris;  Charles
W. McCoy;  James W. Mitchell;  Bobby Ray Morris;
Phyllis M. Miller;  Fred G. Miller;  Charles L. Mathis;
Edward R. Morris;  Dalton L. Magers;  Mary Woodell
(Nolan);  Johnnie F. Newton;  Candis H. Naquin;
Donald J. Newhouse;  Catherine Neal;  Cindy Nolan;
Bobby C. Nivens;  Joanne Nichols;  George Allen Nugen;
Louise Noskowiak;  Gary L. Nicol;  Dennis A. Nicol;
Emma L. Nicol;  Edwin J. Nagel;  Nathan J. Neely;
Lewis L. Norris;  Tony J. Nicolosi;  Joseph Notto P.R. of
the Estate of Frances M. Notto;  Betty A. Nicolosi;  Floyd
F. Newton;  James M. Neal;  Bryant Neal;  R.D.
Newman;  Robert E. Odom;  Kathryn Scott Odom;
Jessica Oakley;  Alba Salazar Ortega;  David L. Overly;
Alexis Oxner;  Scott Outlaw;  Harold E. Olinger;  Jimmy
Gordon Outen;  Patty Y. Outen;  Cheryl A. Oster;

O'Steen Oxendine;  George H. Olson;  Larry
Picklesimer;  Anne Powele;  James L. Preest;  Jan R.
Pfeiffer;  Tammy W. Shuler (Price);  Kendall Parker for
Carolinas Electrical Contractors Association;  Kendall
Parker for Electrical Contractors of the Carolinas;  Ben
E. Plyler;  Iris T. Plyler;  Ratha Ann J. Peay;  A.D. Parr;
Mary J. Parr;  Dessie C. Plyler;  Howard P. Plyler;
Peter L. Parks;  Ruth Ann Perr;  David E. Plyler;
Cynthia J. Parker P/N/G of Zachary Andrew Parker;
Cynthia J. Parker P/N/G of Allie Morgan Parker;
Cynthia J. Parker P/N/G of Peyton Jordan Parker;  Sue
H. Phillips P.R. of the Estate of Sara Wise;  Theresa F.
Phillips;  Doris R. Phillips;  Dale B. Parker;  Ruth O.
Parker;  Richard E. Pershing, Sr. Treasurer for Marion
Area Rental Assn.;  Kenneth L. Ponder;  James F.
Peake;  Frank Peterman;  Myrtis C. Pate;  Lena M.
Pate;  Brandon J. Parkhill;  Jean Plotner;  Shirley A.
Plyler;  Louise A. Presson;  Cary Van Presson;  Jessica
L. Presson;  Amanda G. Presson;  Frank E. Porter, Jr.;
Richard Plotner;  Cynthia H. Pharr;  Paul R. Parker;
Bert Phelps;  Kevin Perkins;  Wendy Perkins;  William
C. Peacock;  Laura D. Peacock;  Eva Mae Pinckney;
Ralph H. Pardue;  Toni A. Pardue;  Thomas A. Phelps;
James Parkhill;  John W. Phillips;  Robert W. Page;
Glenda H. Price;  Donna L. Pierce;  Daniel A. Patterson;
Charles R. Pitts;  Donald Powell;  Mary Lou Powell;
Linda K. Priest;  Helen D. Perry;  Velma S. Polk;  James
R. Pritchett;  Clement I. Pyles;  Karen A. Perrone;
Kenneth J. Pastor;  Vincent Price;  James C. Petty;
Tamara Kochis P/N/G of Sarah Palm;  Nancy C.
Phillips;  Robert T. Phillips;  Barbara Parsons;  John
Perna, Jr.;  Winston P. Poling;  Sue Quackenbush P.R.
of the Estate of Kay Percy;  James L. Quick;  Norma
Parker Rainwates;  Michael A. Renik;  David A. Ruff;
Jimmy R. Rabun;  Bronze H. Rorie;  Heyward
J.Robinson;  Betty G. Russell;  Glenda H. Reeves;
Harold D. Reeves;  Richard M. Roach;  Alva Robinson
P.R. of the Estate of Helen Childers;  Rowland A.
Rausch;  Susan C. Rausch;  Harry Rea;  Russell Reese;
Hurleigh H. Rider;  Donald W. Rush;  Barbara P. Rush;
Margaret Rupp;  Shirley P. Robinson;  Grady C.
Robinson;  Jack L. Roach;  Ronnie L. Roberts;  Justin
Thomas Rainwater, UTMA;  Chloe Ashley Rainwater,
UTMA;  Jordan Eric Rainwater, UTMA;  Kenneth J.

Rudy;  Martha J. Robertson;  Kenneth Richards;
Vivian Richards;  James B. Reeves;  Mazella Risner;  H.
Kirk Reed;  Alfred Robinson;  Elliot Reeves;  M. David
Rabon;  Leo L. Robinson;  Martha W. Rushing;
Thomas Craven Rushing;  Billy Roberson;  Oscar E.
Ridenour;  Billy Rollings;  H. Wilbur Robinson;  Brenda
Rollings;  Mary Rine;  Michael A. Rogerson;  James H.
Ramsey;  Roger K. Rape;  S.C. Robinson;  Billy J.
Rogers;  Charles J. Reiss;  Elwood Rhoden;  Leslie w.
Reid;  Bonnie S. Rogers PR for the estate of Newton A.
Rogers;  Robert C. Rollins;  Dana L. Reynolds;  Carl W.
Raffaldt;  Henry G. Rippe;  Susan J. Rose;  Johnny L.
Roberts;  Russell Reese;  Will Rollins;  Rosalie
Robinson;  CarltonW. Rausch;  Kay H. Reinhart;  Mark
S. Rader;  Otis Register;  Richard D. Roberts;  Raymond
T. Riley;  William Carroll Rollings;  Patricia M.
Rollings;  Jessica Rennick, UTMA;  Phyllis Jean
Redmon;  Benjamin C. Snyder;  Elhame Samadi;  James
C. Shipley;  Joel P. Scott;  Barry B. Sello;  Jason K.
Sello;  Jake Sello;  Gregory Lee Spray;  Jerry B. Snider
P/N/G Katherine Snider;  Dorothy M. Scott P.R. of the
estate of George Scott, Jr.;  Reed W. Smith;  Juanita J.
Steed;  Rita M. Smith;  Jo B. Scott;  David Stuart Siglin;
Doris B. Small;  Ernest H. Stroud;  Les Snider;  Robert
S. Steele;  Lydia Southerland;  James W. Shaw;  Grace
M. Steele;  Billy Clyde Steele;  Greg Sens;  Jean Sens;
Patrick Sens;  Charles E. Sens;  Jeannette L. Sens;
Arizona Stischok;  Marilyn Dix Smith;  Paulette Ann
Stewart;  Joyce B. Sims;  Tracy Sutton;  Mary Jean
Smith P/N/G of Joshua Smith;  Mary Jean Smith P/N/G
of Grant Smith;  Kelsey Smith;  Jenny Lou Spurlock;
Ralph Simpson;  Ray Sullivan;  Betty A. Spearman;
Herbeat C. Spearman;  Ernest Sims;  Uldine A.
Shockley;  Janet W. Stone;  Irene Salas;  Margaret E.
Sempier;  Thomas P. Smithberger;  Belinda J. Sims;
Ron Sanderson;  Janet M. Sheppard;  Timothy Sistar;
Robert Skelton;  Larry E. Staats;  Janice R. Staats;
Gary Stevens;  Margaret J. Schad;  H.Neil Smith;
Donald Stauch;  Russell R. Solomon;  Sherwood
Schroer;  Dean Swofford;  Russell S. Stuart;  Charlie B.
Sanderson;  Robert G. Scharff;  William H. Steele;
Donald G. Stacks;  Lisa W. Smith;  Ella Sue Stokes;  W.
Ben Stokes, Jr.;  Ella Sue M. Stokes P/N/G of Melissa
Stokes;  Ella Sue M. Stokes P/N/G of Kenneth William

Stokes;  Ella Sue Stokes P/N/G of Kathryn Elizabeth
Williams;  Randall P. Satterfield P/N/G of Andrew Paul
Satterfield;  Randall P. Satterfield P/N/G for William
Scott Satterfield;  Randall P. Satterfield;  S. William
Sandridge;  Margaret D. Stiles;  Morris A. Stapleton;
Rosco Singleton;  Jessica Sistare;  Evelyn D. Shuman;
Richard J. Skelton;  Hugh R. Sprinkle;  Audrey H.
Schwab;  George Schwab;  John W. Stevenson, III;
John W. Stevenson, Jr.;  Robert B. Steele;  Elinor J.
Sansbury;  Jerrel Sansbury;  Roberta Dix Sullivan;
Garry D. Smith;  Larry William Sanders;  Gladys
Selzer;  Craig A. Slessinger;  Barbara A. Stofcheck;
John Sartor;  Mathew Sartor;  Gary B. Smith;  Bernard
A. Snider;  Mary T. Stevenson;  Francis E. Stisser;  John
H. Sartor III;  Rober L. Sovde;  Anthony Simmons;
Ronald M. Syer;  Charles Sivey;  Donald T. Souder;
Debra J. Strouse;  Thomas E. Schaefer P/N/G for Marlee
Schaefer;  Max L. Sheets;  Earnest W. Sheppard;
Thomas E. Schaefer P/N/G for Jose Schaefer;  Thomas
E. Schaefer P/N/G of Jenna C. Schaefer;  Marilyn G.
Sanders;  Gordon Schultz;  Joel R. Snyder;  John F.
Sens;  Mary L. Sherman;  Angela Laney Smith;  Angela
Laney Smith for Warren McCray Smith;  James
Stephens;  Gail Stephens;  Steven K. Schlarb P.R. of the
Estate of Oleen E. Schlarb;  Donald Sanderson;  Joseph
M. Smithberger;  Gloria M. Snyder;  Bobby J.
Smothers;  Laura Stroia P/N/G of Davina Stroia;  Laura
D. Stroia;  Donald L. Sharp; Thomas H. Strome;
Howard E. Sulser;  Marthalee Schaub;  Connie Jo Stage;
Paula Smallridge;  David W. Stoer (Levering);  James F.
Sistare;  Joan W. Sistare;  Kathy Sherman;  Sam B.
Smith;  Jean F. Sturgis;  Peggy L. Schoen;  Billie Jo
Stevens;  Ralph D. Siglin;  Alvin Keith Terry;  William
R. Tobin;  Julius C. Toth;  David A. Tighe;  Murray S.
Taylor;  Terry Tharp;  Harvey Edward Thrower;  Jack
W. Tannehill;  Ernest E. Tolbert;  Marion Tucker;
Trudy L. Tharp;  Joseph F. Tarillion;  William H.
Truesdale;  Anita S. Tarlton;  Paul D. Morse P/N/G of
Joel Jacob Talladay;  Paul D. Morse P/N/G of Josiah J.
Talladay;  Nellie F. Townson P.R. of the Estate of Wilbur
Towns;  Bonnie A. Thorpe;  Carrol W. Tropf;  Vonda
Turner;  Hazel L. Taylor;  Mildred M. Tedrick;  Margie
H. Tyson;  Aaron D. Tyson;  Mildred Tedrick PR of the
estate of Merle Tedrick;  Les Tindal;  Sarah P. Towns;

L. Fearell Towns;  Urban Erich Tischensky;  Ronald L. Thomas;  Pamela S. Truesdale;  Mary Lou Turner;  Jimmy Turner;  William E. Thomas;  Charlie B. Teal;  H. Joan Tucker;  Nicolas Ryan Thomas;  James H. Towns;  Frank Turman, Jr.;  Linda Turman;  Newell Laverne Turnage;  Steve Toth;  Sherry Thai;  Joan L. Adkins P.R. of the Estate of Matilda Totten;  Gary W. Thompson;  Samuel Thomas;  Carolyn Z. Ulrath;  Aaron F. Unroe;  Mary Ann Ulrich;  Jackie Upchurch;  Wayne F. VanDusen;  Carter Vincent;  Noah Vincent;  Ronald Vollrath;  Mary E. Vogt;  Mary J. Vetorino;  Clyde J. Vincent, Jr. Joshua Vincent;  David H. Huge for The Vanguard Group-32;  Anne P. Vasile;  Charles I. Williams;  Jaime Leigh Wile;  Brenda Watts;  Grace M. Williams;  Julian Wolfe;  Velma C. Williams;  Olin D. Williams;  William A. Westmoreland;  Frances D. Williams;  Mendel L. Williams;  H.A.Weaver;  Frances Wolfe;  Edna H. Williams;  Bobby J. Wright;  Henry J. Widrig (Hank);  Kim Poknan White;  Chris Widrig;  Alicia Widrig;  Deborah S. Widrig;  Barbara S. Wilson;  Stanley Wright;  Kendra D. Wood;  James H. White;  Madonna L. Wood;  Richard K. Wood;  Theresa M. Wood;  Edgar D. Weeks;  Wilbur Wollerman;  Connison Wilson;  Robert Williamson;  William F. Williams;  Juanita L. Weber;  Melody Whittington;  Henry O. Wallace, Jr.;  Janice R. Wells;  Becky Webb;  John H. Williams;  Thomas Webb;  A.O. Wing;  Woodrow Wilson;  Theresa Wicka;  Wagner Family TST;  Patricia Eileen Wade;  Roger Wagner;  Sharon L. Wagner;  Gloria J. Williams;  Andy S.. Wolfe;  Henry F. Williams;  Wakatomica Lodge F & AM #108 by Daniel Scott, Treasurer;  Robert M. Williams;  David L. Willits;  James E. Wilson;  W. Doug Westmoreland;  Fay G. Wright;  Zeno F. Wasserman, Joint Living Trust OT 07-29-96;  Samuel P. Walston;  James R. Wolfe;  Cindy Wright;  Charles S. Weber, Jr.;  Jimmy L. Wood;  William J. White;  Jack M. Woodworth;  Nancy Walters;  Dave Wroten;  Kay A. Wroten;  Earl M. Wilcox;  Christine H. Wilson;  Robert W. Wilson;  Barbara A. Wilson;  Barry J. Williams;  Roger Eric Walters;  Alberta M. White;  Mike E. Dewerdt;  Stephen J. Wander;  Willard V. Winter;  Mary Alice Winter;  Terry R. West;  Roger W. West;  Sara C. Williams;  Willie S. Westmoreland;  Marvin Walden;

Leland B. Wells;  David L. Watson;  Steven J. Wallace;
Walter H. Weaver;  Willits Family TST Dorothy Willits
Trustee;  Wiens Family Trust, Mary Wiens, Trustee;
Jean M. Wagener, Trust;  William B. Wylie;  Elmer A.
Wagener;  James E. Wilson;  Ruth A. Wagener;
William T. West;  Euna Mae Whitfield;  Melvin E. Wilt;
Betty J. Webster;  Wilbur L. Wren;  Leland White;
Alexander Watson;  Shuxian Wang;  Robert W.
Westmoreland;  Jennifer C. Wallace;  Elliot C. Wallace;
Lauvenia Winn;  Gary L. Ward;  Marilyn B. Wooten
P.R. of the Estate of James O. Wooten;  Gerald Watts;
Donna L. Walters;  Noel Young;  William E. Young;
Levi J. Yoder;  Andrea Young;  Wayne A. Zurenda;
Helen D. Zimmerman;  Michael Curry;  Carol Stewart;
Ken Skews;  Audrey Husted;  Gwin G. Brafford;  Ellen
Horton;  Theodore J. Marek;  Cecil E. Horton;  Thomas
L. Adams;  Helen E. Brittain;  Mary E. Smithberger;
Lois G. Lutz;  Linda Eirich;  Linda Enrich for Keckley
Rural Life Centers Inc.;  Nina J. Boucher;  William C.
Williams;  William C. Williams;  Mae G. Malone;
Joseph Hoffman;  Luella F. Drumm;  Fern Woodie;
Barbara S. Wilson;  Janice P. Demby;  John David
Craver;  Carolyn Sue Hoffman;  Elizabeth C. Demby;
Barbara E. Morris;  Grace N. Couch PR of the Estate of
Brenda C. Hilliard;  Melva S. Benton;  Jennifer Pardue
Cauthen;  Ronnie A. Walters Barbara C. Walters;
Judith M. Cleary;  Joe F. Halford;  Mildred K. McCabe;
Randall Roy Fry;  John B. Harrington for Harrington
Environmental Services, Inc.;  Thomas A. Harrington;
Jennifer N. Bullard;  Margaret Italiano;  Joseph Zuber;
Robert W. Wilson;  Robert S. Hathaway;  Violet R.
Hathaway;  The Hathaway Family Trust;  Russell Lutz;
Michael E. Holland;  Gregory A. Benton;  Irene A. Croft
PR of the estate of Harold E Croft;  Irene Croft;  Joan L.
Adkins;  Sylvia P. Morris;  James D. Farahay;  Janice
Uhler;  John S. McLeod, Sr.;  Michael Smith;  Gary D.
Mexicott PR of the Estate of Dorothy M. Kecskes;  David
A. O'Steen, Sr.;  Amelia F. Catoe;  Sylvia W. Crenshaw;
Robert Bryant Drakeford;  Friedlan f. Ellis;  Thomas
Jack Estridge;  Mae Mungo Faile;  John T. Lucas;
Jackie B. Lucas;  Arthur E. Pardue and Joan B. Pardue;
Elsie M. Phillips;  Sandra H. Reece;  Estelle Short;
Jessie R. Short;  Donald E. Sinclair;  Stanley H. Smith
and Mary L. Smith;  Harold K. Spivey and Brenda L.

Spivey;  Richard T. Lindsay;  Marguerite M. Curtis;
Sylvia H. Stevens PR of the Estate of Thomas Haynes;
Betty B. Wallace and Henry O. Wallace, Sr.;  Betty B.
Wallace P/N/G of Armando Rivera;  James G. Ascanio;
Suzanne R. Ascanio;  Barbara Faulkenberry;  Bobby
Gene Adams Danny Clyburn;  John C. Outen;  Frances
H. Outen;  Joel Horne;  Ira A. Stacks;  Peggy
Daughtery;  Claudine L. Pate;  Pablo D. Martinez;
Daniel E. Walton;  Genova Witzel;  Eula Dodd Kinney;
Pauline B. Gardner;  Michaell L. Monska;  Janice T.
Thaxton;  William H. Thaxton;  Thomas A. Cameron;
John J. Dete;  Denise B. Perry;  Judy Metz;  Kevin Metz;
Sara G. Moss;  Beatrice Palmer;  Delores A. Jackson;
Stanley Poling, Treasurer for West Mansfield Baptist
Church;  Stanley Poling;  Tammy G. Smith;  Dall H.
Miller;  Naomi R. Miller;  Gettys Michael West;
Dorothy M. Black;  Donald M. Burgess;  Karen E.
Burgess;  Gudrun Goebel;  David B. Perry;  Betty Jean
Thomas;  Kevin Thomas O'Brien;  Ken Meadows;
Thomas E. Harmon;  Nancy C. Willetts;  Yi Ping Xie
and Jing Heng Wen;  Shannon Threatt Smith;  Lori
Sanchez;  Gerald A. Fornes;  Kathleen Fornes;  Martha
W. Pitts;  Bill Parrish P.R. of the Estate of Brantley
Parrish;  Milisa Rizer P.R. of the Estate of Wanda M.
Rizer;  Barry A. Black;  Naomi R. Miller;  Frances
Canup;  Dan Edwin Mattox;  Amy M. McGuinn P.R. of
Estate of Sarah E. Melton;  Pauline B. Cabaniss;
William P. Cabaniss;  Laura E. Perry;  Brenda K.
Pollock;  Lala Funderburk;  Keith D. Blackmon;  W.C.
Rutledge, Jr.;  Martha C. Rutledge;  Hurley R. Mullis;
Rachel Mullis;  Curtis Borror;  Marjory F. Foster;
Donald W. Owens;  John L. Fezio;  Lauren Gingerich;
Rhonda S. McCain;  John K. Everett Parent and Natural
Guardian  of Giovanna Eckstine;  Gary N. Helmick;
Melvin Robinson, Jr.;  B. James Steger;  Joanne L.
Pierce;  John F. Gill;  Charles J. Kreusch;  Sarah L.
Taylor;  Kenneth E. Taylor, Trustee;
and Vera J. Funderburk, Personal Representative  of
the Estate of Harold Funderburk,

        Plaintiffs,

vs.

**Berkshire Hathaway, Inc.; Leucadia National Corporation; Thomas Mara; Berkadia, LLC; Berkadia II LLC; Berkadia Equity Holdings LLC; Berkadia Managment LLC; Finova Group, Inc.; and Finova Capital Corporation, Inc.,**

  **Defendants.**

---

## COMPLAINT
## (JURY TRIAL DEMANDED)

---

### Summary of Complaint

The plaintiffs in this case are numerous individual purchasers of subordinated notes from the now bankrupt Thaxton Group. This case involves Finova's plan to manipulate Thaxton for huge profits and then to escape from the failing company using tens of millions of dollars swindled from unsuspecting noteholders. Replicating the process, Berkshire-Hathaway, Leucadia and Berkadia manipulated the failing Finova by breaching its agreements with Thaxton and forcing Thaxton to accelerate the sale of fraudulent notes.

A.    Finova cobbled together the present form of Thaxton to bring its rediscount loan department over the $1 Billion level, and set in place what was effectively a Ponzi scheme where Finova could pull out massive profits before the inevitable failure of the insolvent enterprise:

- Finova used its control of Thaxton's purse strings to force a $150 million acquisition that rendered the overall enterprise completely insolvent.

- Finova expected to, and did, derive massive earnings from the quarter-billion dollar loan facility.

- Finova's strategy was to have Thaxton transfer the risk to unsuspecting note purchasers before the underlying insolvency could no longer be hidden.

- In Finova's own words, it "allowed" Thaxton to characterize $8 million of the Finova debt as equity, thus hiding Thaxton's insolvency.

- By the end of 2001, even after Thaxton's note sales had reduced the Finova debt by $30 million, Finova internally discounted it further with nearly $40 million in writedowns and reserves.

B.    In 2001, Finova itself experienced financial problems. Like vultures circling a dying animal, Berkshire Hathaway and its cohorts laid their own saprophytic plans even before Finova filed for bankruptcy:

- *Berkshire's plan, with Berkadia and Leucadia, was to buy debt of Finova cheaply, then liquidate the company to repay itself at a premium while deriving hundreds of millions in profits from funding the liquidation.*

- *The plan as disclosed called for efficient liquidation, but Berkadia decided even greater profits could be made off some accounts, such as the Thaxton account, by using extraordinary tactics.*

- *Thomas Mara of Bercadia personally dealt with Thaxton – beginning before any Berkadia involvement had even been approved – to unilaterally impose a secret termination of the Finova facility with Thaxton, forcing a desperate Thaxton to accelerate its note sales, and ultimately leading to Jim Thaxton's suicide when he realized the what had happened.*

- *As a result of Bercadia's intervention, Finova gained such paydowns of the Thaxton debt that it entirely recouped the insecure portion by the time Thaxton went bankrupt.*

*Warren Buffett described the deal saying  "We supplied the money, and Leucadia supplied the brains."  In fact, the money flowed into the pockets of Berkshire and Leucadia, and it was supplied from the savings and retirement accounts of thousands of folks who thought they were buying the equivalent of a bank CD, and had no idea they were dealing with an insolvent company seeking to appease a voracious predator.*

*This action seeks damages under the theories of Civil Conspiracy, Securities Violations, Unfair Trade Practices, Civil Racketeering ("RICO") Law, arising from the Defendants' pattern of criminal activity, including bank fraud, extortion, violation of banking laws, and bankruptcy fraud.*

### Parties and Jurisdiction

1.    Plaintiffs are various note holders of The Thaxton Group, Inc., who are too numerous to be individually described in this paragraph.  Information concerning the individual plaintiffs is set forth in Exhibit A, attached hereto.  (Exhibit A assimilates information provided by The Thaxton Group in its bankruptcy filings as well as information provided by the plaintiffs, and plaintiffs reserve the right to update this exhibit as more current information becomes available .)  As reflected on Exhibit A, many of the plaintiffs are citizens and residents of the State of South Carolina, and others are residents of other states, including but not limited to Ohio, North Carolina, Georgia, and Mississippi.  Some of the original note purchasers have not survived to bring this action, some have

been forced to assign their claims in order to meet pressing financial needs, and some are underage or incapacitated, as a result of which the interests of some of the original note purchasers are represented herein by various executors, personal representatives, assignees, legatees, devisees, guardians, conservators, and other persons acting in representative or successor capacities. For simplicity, all Plaintiffs will be referred to generally as "note holders" or "note purchasers".

2.    Defendant Berkshire Hathaway, Inc., on information and belief is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business some place in Nebraska. As set forth more fully below, Berkshire engaged in activities in the State of South Carolina in its dealings with Thaxton, directly or through its agents.

3.    Defendant Leucadia, on information and belief, is a corporation organized and existing under the laws of the state of New York with its principal place of business in the State of New York. As set forth more fully below, Leucadia engaged in activities in the State of South Carolina in its dealings with Thaxton through its officers and agents.

4.    Defendant Thomas Mara is an individual who is a citizen and resident of the state of New Jersey, and who came to South Carolina and had dealings with The Thaxton Group in South Carolina, in a manner that, as alleged below, affected the rights of the Plaintiffs. On information and belief Mara acted individually and as an agent and controlling person of Leucadia and Berkadia, and, thus, as controlling person of Finova, and Thaxton..

5.    Defendant Berkadia, LLC, is, on information and belief, a limited liability company organized and existing under the laws of the State of Delaware, and on information and belief conducting the majority of its operations out of the office of Defendant Leucadia in New York. As set forth more fully below, Berkadia engaged in activities in the State of South Carolina in its dealings with Thaxton. For convenience, except where the context indicates otherwise, the

expression "Berkadia" as used herein shall refer to Berkadia and its related entities with whom, for whom, and through whom it acted, including Berkshire Hathaway, Leucadia, and Thomas Mara. Berkadia is on information and belief a corporate shell with no employees, no independent activities, no true place of business, and no other function except to act as a pass-through by which Berkshire Hathaway and Leucadia receive payments from Finova and exert control over Finova.

6.     Defendants Berkadia II LLC, Berkadia Equity Holdings LLC and Berkadia Management LLC are on information and belief affiliates or subsidiaries of Berkadia LLC, dominated by Berkshire and Leucadia, which participated with Berkadia in carrying out Berkadia's role in the events set forth below as agents of Berkadia, with whom they are jointly and severally liable.  For convenience and until such time as discovery reveals the precise roles played by each, all of the Berkadia entities are referred to below as "Berkadia."

7.     Defendant Finova Group, Inc. is on information and belief a financial holding company organized and existing under the laws of the state of Delaware and with its principal place of business in Arizona.

8.     Defendant Finova Capital Corporation is on information and belief a wholly owned subsidiary of Finova, similarly organized and existing under the laws of the state of Delaware and with a principal place of business in Arizona.  Finova Capital did business with Thaxton, conspired with Thaxton, and committed tortious act as set forth more fully below, all in the State of South Carolina.  Particularly after the takeover of Finova by Berkadia, as detailed below, Finova was a link in the control chain by which Berkshire Hathaway and Leucadia controlled Thaxton and its subsidiaries and affiliates, utilizing direct control through their agents, officers and employees, including numerous subsidiary and affiliate companies including the Berkadia entities and Finova entities.  However, while this control chain involved numerous business entities, the actual exercise

of control was on information and belief often much more direct, as, for example, when Tom Mara of Leucadia interacted directly with Thaxton, in which case the corporate chain of control was observed only as a theoretical basis to allow Mara's exercise of direct control, and the actual role of the corporate entities was merely to acquiesce in the control exerted by Mara, Leucadia, and Berkshire Hathaway.  For convenience, because Finova Group at all times was a controlling person of Finova Capital, the two entities are referred to hereafter simply as "Finova" except where the context indicates otherwise.

9.     Jurisdiction in this court exists pursuant to Section 23 of the Securities Act of 1933, 15 U.S.C. § 77v,  the federal Racketeering Laws (the "RICO Act"), 18 U.S.C. §§ 1961 *et seq*., 28 U.S.C. § 1331, and 28 U.S.C. § 1367,  because this case involves  federal questions , and state law issues arise out of the same nucleus of common facts and are subject to this court's jurisdiction based upon supplemental jurisdiction.

**NOT PRESENTLY A CLASS ACTION**

10.     This action is not brought a class action, but plaintiffs reserve the right to move for certification as a class action if developments in the case support class certification.

**FACTUAL BACKGROUND**

***Basis of Factual Allegations***

11.     As appears more fully below, the individual plaintiffs are purchasers of notes from The Thaxton Group, Inc., or, in some cases, successors in interest to note purchasers or assignees of claims of note purchasers.

12.     The notes represent obligations of The Thaxton Group, Inc., and were sold to the plaintiffs by The Thaxton Group, Inc. and its subsidiaries and affiliates, including various wholly-owned subsidiaries of Thaxton, Carolinas First Financial and Carolinas First Investment, and various

agents and employees of those companies, including James Garrett, all of whom are referred to collectively as the "Thaxton Sales Team."

13.     Plaintiffs only dealt with the Thaxton Sales Team in connection with their purchases of notes, and in connection with their purchases no Plaintiffs had any dealings with or knowledge of any of the defendants, or agents, affiliates, or subsidiaries of defendants, other than the Thaxton Sales Team at the time of the relevant transactions.

14.     The facts set forth in this complaint concerning the defendants are derived from a variety of sources, but not from the plaintiffs themselves, who have no personal knowledge of the defendants derived from the time relevant to the complaint and who will not seek to introduce any evidence concerning the defendants' actions, except for actions of defendants through the Thaxton Sales Team. Sources of the allegations in this complaint include the following:

    a.     Public filings of Thaxton and defendants, including SEC filings, bankruptcy filings, court filings, and the like;

    b.     Documents obtained by plaintiffs attorneys in other litigation involving plaintiffs as class members;

    c.     Testimony developed in other litigation in which plaintiffs were involved as class members;

    d.     Information gleaned by experts employed by plaintiffs and related parties in prior litigation;

    e.     Investigations by plaintiffs' attorneys;

    f.     Information provided by third parties, such as Thaxton and its employees.

15.     The plaintiffs have knowledge of their individual dealings with the Thaxton Sales Team, which generally involved verbal discussions and use of a variety of printed materials.

CrippledChildren-v-BerkshireHath-Cpl                    -21-

However, the causes of action set forth in this complaint are not intended to arise from the individualized dealings of Plaintiffs with the Thaxton Sales Team, but rather from actions taken by the Defendants and Thaxton generally, through the organization of the Thaxton entities, public filings made by Thaxton, and transactions between and among the defendants and Thaxton that did not involve any individual plaintiffs.

16.     The damages each plaintiff asserts in this complaint arise from the inability of each plaintiff to recover funds he or she invested in subordinated notes of the Thaxton Group. With the exception of minor scrivener's errors, Exhibit A attached hereto, together with records maintained by The Thaxton Group as debtor in possession in its bankruptcy and by the Bank of New York, indenture trustee for the Thaxton note offering, present the most accurate accounting of the losses suffered by the plaintiffs.

17.     As a result of the foregoing, the individual plaintiffs have knowledge regarding their investments in Thaxton notes and their loss of their investment, but that knowledge merely duplicated the records already available and assembled in other records relating to the Thaxton note program, as set forth above.

18.     In short, the individual plaintiffs do not have any particularized knowledge concerning the basis of this action, except for information that is more easily and economically derived from other, readily available sources and summaries, and in this complaint do not rely upon any information or evidence particular to any individual plaintiffs other than the fact that each plaintiff or his predecessor purchased a Thaxton subordinated note in the amount reflected in Exhibit A and in the Thaxton records and records maintained by the Bank of New York, Indenture Trustee for the note offerings.

19.     Notwithstanding the foregoing, to the extent defendants may elicit any additional information concerning individual plaintiffs, plaintiffs reserve the right to utilize such information at trial.

### *Background of Thaxton*

20.     On information and belief, the predecessor entity to The Thaxton Group was originally incorporated in 1978 under the name C. L. Thaxton & Sons.  The company's name was later changed to The Thaxton Group Inc.

21.     Originally, the company's main business was insurance sales.

22.     C.L. Thaxton was the founder of the company, and his son, James Thaxton later took control of the company.

23.     Over the next 10 years, James Thaxton began to expand the company's business into other areas, including consumer finance and automobile loans.

24.     James Thaxton's expansion efforts were initially successful and Thaxton opened additional offices.

25.     In order to expand, Thaxton required working capital to be loaned out under its financing agreements.

26.     In the early 1990s, this funding was provided by Transamerica.

27.     Meanwhile, Finova, a commercial lender that specialized in asset-based lending, such as loans for commercial aircraft, identified a business opportunity lending to finance companies and sought to expand its business in that area, which is sometimes referred to as "rediscount financing."

28.     In 1993, Finova formed its "RDF" division, designed to target rediscount financing.

29.     Based on Finova's decision to pursue RDF or rediscount funding, it appears Finova decided that loans to finance companies could provide lucrative income through elevated interest

rates that could be charged as a result of the high interest rates paid by consumers to finance companies.

30.    In 1995, Finova acquired the Thaxton loan from Transamerica.

31.    In March, 1995, the relationship between Finova and Thaxton was sealed with a $35 million credit line agreement.  This was the upper limit of the typical loans offered by Finova's RDF division, and it also represented the upper limit of funding that would be readily available to a company like Thaxton, given the nature of its business and the limited amount of other funds it held from equity investments and retained earnings.  As early as 1995, for that reason, it would have been difficult or impossible for Thaxton to find a commercial lender willing to provide a takeout loan for the Finova loan or an alternative source for a commercial loan to fund further expansion.

32.    Around the same time, in 1995, Thaxton sought to raise money to expand by means of a public offering of stock, or IPO.

33.    The IPO was not successful, however, Thaxton did sell some stock, mainly to friends and acquaintances of Jim Thaxton.

34.    Going forward, Finova provided funding for Thaxton's expansion and Finova's funds took the place of the funds that earlier had been sought through the attempted IPO.

35.    In the period from 1995 through 1997 Thaxton was financed almost entirely by loans from Finova; however because its expansion had not progressed so much at that time, the amount of equity it had was sufficient to provide a modest debt to equity ratio.

36.    In September, 1997, Finova entered into an amended loan agreement with Thaxton that was designed to enable Thaxton to expand significantly.

37.    Under the initial amended loan agreement, Thaxton received a revolving line of credit that made funds available in an amount limited to 85% of the value of Thaxton's assets.

38.    This revolver would be similar to credit lines available to many businesses.

39.    In addition, Finova agreed to provide an "over-advance" facility allowing Thaxton to borrow up to the full amount of its assets.

40.    The credit limit of the total debt facility, including all tranches, was raised to $100 million, which was the largest credit line to a single customer permitted under Finova's internal policies at the time.

41.    Finova's own description of its business indicated that its typical loans in the RDF division ranged from a few million to about $35 million.

42.    An over-advance facility of the kind Finova extended to Thaxton had the advantage of allowing Thaxton to expand, since it was doubtful that Thaxton could have come up with the necessary equity to fund expansion efforts otherwise.

43.     The benefit to Finova of this arrangement was that as Thaxton expanded and borrowed more and more money, it would pay more and more fees and interest.

44.    Another advantage to Finova was the fact that the interest rates on funds advanced under the over-advance facility earned higher interest rates.

45.    Over the years prior to Thaxton's bankruptcy in 2003, Finova earned in the range of $65 Million in fees and interest on its loans.

46.    The risk of the over-advance facility to Finova was that in the event of default it would be unlikely that Finova would be able to recover all of the original funds advanced under the over-advance facility.

47.    This problem was addressed through a note sales program that was begun in 1997.

48.     Finova's internal memoranda show that it expected and planned on Thaxton's sale of subordinated notes that would reduce the Finova loan balance at least by the amount of the over-advance.

49.     Finova's internal loan documents show that it was only willing to take on the increased over-advance risk because of the existence of the note sales program that would later reduce Finova's exposure.

50.     It appears that the Thaxton note sales program produced the following approximate year-end balances during the first few years of the program:

      a.     Thaxton sold about $3.2 Million in notes in 1997;

      b.     The note balance rose to $10.3 Million in 1998 (including new sales, renewals, and existing loans);

      c.     The note balance rose to $18 million by the end of 1999.

      d.     Thereafter, note sales increased dramatically, with outstanding notes in the range of $120 million by the year 2003.

51.     While note sales provided the equivalent of an "equity cushion" for Finova, they resulted in virtually all of Thaxton's operating capital coming from borrowings, creating various problems, including but not limited to the following:

      a.     Lack of equity resulted in a large risk for noteholders;

      b.     Lack of equity and large debt financing made the Thaxton Companies, particularly as they continued to expand in 1999, intrinsically insolvent;

      c.     Thaxton's insolvency meant that eventually it was destined to fall into bankruptcy or other liquidation;

d.    Finova knew early on that eventually it was likely to be forced to resort to its collateral to collect out the Thaxton loan;

e.    Finova's over-advance lending resulted in a situation where Thaxton would never be able to find a take-out lender, creating the ability of Finova to force Thaxton to accede to its demands as to business decisions.  In part this complaint focuses on the actions that Finova forced Thaxton to take as a result of its actual or implicit threats of financial and personal ruin that it could impose upon Thaxton by calling its loans.

### Finova's Involvement with Thaxton's Business

52.    As Finova loaned more and more money to Thaxton, the relationship grew into one where Thaxton was dependent on Finova and Finova developed the ability to control Thaxton in its major business decisions.

53.    Thaxton was dependant on Finova in various ways, including the following:

a.    Finova was willing to finance Thaxton's operations, offering funding even above a 100% loan to value ratio;

b.    Finova was willing to finance Thaxton's operations even though Thaxton had very little equity in comparison to the total size of the business;

c.    Finova was willing to finance Thaxton's expansion by financing its acquisition of existing loan companies;

d.    Finova was willing to provide a level of financing (total line of credit) in excess of the financing that Thaxton could obtain elsewhere;

e.    Finova provided business advice and due diligence to Thaxton in conjunction with its lending operations, so that Thaxton was strongly encouraged or required to comply with Finova's suggestions;

CrippledChildren-v-BerkshireHath-Cpl
-27-

f.      As Thaxton grew and its loans with Finova increased, Thaxton reached a point where there was no alternative lender, as a practical matter, so that Thaxton was forced to comply with Finova's suggestions and demands.

54.    This complaint is not based on the fact that Finova had inherent power over Thaxton as a result of the foregoing; it is based on Finova's use of that power to dictate actions of Thaxton.

55.    Finova derived significant benefits from its relationship with Thaxton, including but not limited to the following:

a.      Thaxton's rapid growth helped Finova's RDF division grow rapidly, and in fact was a key element in Finova's ability to reach its goal of $1 billion in RDF financing (the line of credit to the Thaxton entities in the amount o f $250,000,000 alone would comprise 25% of that goal, as compared to numerous loans to small companies in the range of several million each);

b.      Rediscount lending, to lenders whose own loans were at extremely high rates, allowed Finova itself to charge higher than usual rates for many other kinds of commercial loans, and thus  potentially to earn higher profits;

c.      Lending at higher loan to value ratios under the over-advance facility permitted Finova to charge even higher interest rates on those parts of the loans, and thus to earn even greater profits;

d.      While the Thaxton loan, taken as a whole, was a risky one that, had the full circumstances been revealed, would have been impossible to sell to another lender, Finova's risks could be significantly reduced by having Thaxton sell subordinated notes, thus allowing Finova to make profits up front on the loan but to escape from a long term exposure on the over-advance portion of the loan as subordinated notes were sold.

56.    When Finova increased Thaxton's line of credit to $100,000,000, it appeared to give Thaxton all the money it would need for its anticipated expansion.

57.    In fact, Finova began to exercise greater and greater control in Thaxton's affairs after that increase in the line of credit.

58.    By 1998, Finova was making major business decisions for Thaxton, although other executives of the company were left in charge of day to day operations.

59.    As one example, Finova caused Thaxton to purchase Budget Finance Company on terms that were only favorable to Finova, including but not limited to the following:

a.    Finova had previously financed Budget, which had been in default on its loan with Finova for over a year, and which was on the verge of bankruptcy;

b.    On information and belief, liquidation of the Budget loan would have required Finova to report a significant loss, in excess of one million dollars;

c.    On information and belief, the operations of Budget itself were such that the company could not have been sold for anything approaching the true value of the loans it held;

d.    On information and belief, Finova developed a plan of selling Budget to Thaxton by having Thaxton assume the entire Budget loan, so that Finova would not show any loss on the deal at all, even though such a purchase meant that Thaxton would have to pay far in excess of the true value of Budget to purchase it;

e.    Finova used its power over Thaxton to cause Thaxton to purchase Budget;

f.    In recognition of the inherent losses built into the Budget acquisition, Finova lowered some of its loan fees to compensate Thaxton for some of the additional taxes that

Thaxton would have to pay as a result of writing off the goodwill associated with the Budget purchase;

g.    Because Budget was comparatively small compared to the overall Thaxton Companies, acquisition of this unprofitable company did not threaten an immediate impact on Thaxton's operations, so Finova was able to salvage a bad loan in the short term, while note sales of Thaxton eventually resulted in third parties, the plaintiffs, picking up the losses that previously would have been Finova's.

60.    In 1998, Finova also decided to use its relationship with Thaxton to accomplish a very large acquisition.

61.    Finova became aware of the fact that a company called FirstPlus was in financial trouble and might be headed into bankruptcy.

62.    Firstplus had four subsidiaries in the consumer loan business that Finova wanted to add to its RDF division.

63.    On information and belief, Finova was motivated to acquire the Firstplus companies for at least two reasons, the first being the size of the transaction, which would be in the range of $150,000,000 and push the RDF division over one billion dollars, and the second reason being that Finova was familiar with at least one of the Firstplus subsidiaries ("Southern Management") and knew it to be a good acquisition target, even if the remainder of the companies were not good targets.

64.    On information and belief, Finova elected to pursue the acquisition of all four Firstplus companies, both because the transaction would be a larger one – which would be to Finova's benefit – and also because bidding on all of the companies together would be a preemptive

bid that would enhance the chances of closing a deal compared to other potential bidders who might be unwilling to bid on all of the companies together.

### Growth of the Finova-Thaxton Enterprise

65.     Prior to the Firstplus deal, Finova had been able to structure its deals with Thaxton so that they appeared to exist within the traditional lender-borrower relationship, although the nature of that relationship was unusual because of the amount of control that Finova had and, more important, actually exercised in making business decisions for Thaxton.

66.     To accomplish its goals in acquiring the Firstplus companies, Finova had to go beyond the traditional lender-borrower relationship, and to create a new enterprise, the structure of which was never completely defined.

67.     Finova was the leading participant in the enterprise, providing financing and making the major decisions.

68.     The basic purpose of the enterprise was to earn money for Finova, while providing it protection against liability by carrying on business through other named companies.

69.     Other members of the enterprise operated through a shifting series of business entities, all generally sharing the Thaxton name.  They included, from time to time, The Thaxton Group, TIC, TLP, and Carolinas First Financial and Carolinas First Investments.

70.     As controlling persons of the enterprise and as the principal beneficiaries of the enterprise's activities, defendants were also members of the enterprise, although the Berkadia defendants did not become involved until 2001.

71.     Beginning at the time of the FirstPlus deal, Finova oversaw the ongoing activities of the enterprise, as it shifted through a variety of formulations and companies were combined or split off.

CrippledChildren-v-BerkshireHath-Cpl                    -31-

72.     There were various reasons that the Thaxton companies had to be split off or re-arranged in order to further the ends of the enterprise, including but not limited to the following:

a.      In general, Finova wanted to "acquire" (using its expression) consumer loans through Thaxton to earn high returns, but it wished to use Thaxton to insulate itself from liability and to sell subordinated notes so as to pass the risk of loss on to third parties;

b.      TIC was formed at Finova's direction to acquire Firstplus because Finova's own internal policies disfavored loans in excess of $100 million to a single entity, and its own lenders placed a somewhat higher cap on loans to single entities, based on a percentage of Finova's assets.  Thus, Finova required the structure in order to mislead its own investors;

c.      Carolina's First was originally owned by Thaxton and known as Thaxton Securities, but to meet regulatory requirements to enable note sales to continue, it was spun off and became a nominally independent entity, although it remained under the ultimate control of Thaxton and Finova, its sole purpose being to sell subordinated notes;

d.      Finova facilitated the spin off of RBE by financing the creation of TLP with a non-recourse loan that it wrote off immediately (but which was later paid back out of note sales). The purpose of the spin off was to remove negative cash flow from the books of TGI so as to enable note sales to continue – although as a practical matter TLP continued to sell notes through TGI;

e.      Although TIC and TGI were nominally separate companies, they had to combined to meet accounting and legal requirements for disclosure purposes to continue note sales.  However, even though Finova and Thaxton dealt with the relationship as a unitary one, Finova continued to carry two separate loan facilities on its books to deceive its

own lenders as to the nature of its relationship with the Thaxton companies, until shortly before Finova's bankruptcy, when it no longer mattered.

73.     The completed acquisition of the Firstplus companies in February, 1999 marked a complete change in the nature of the Thaxton companies.

74.     Prior to 1998, Thaxton had been run as an ordinary business, in which the main goal of the company was to achieve profitable growth.

75.     The growing dominance of Thaxton by Finova in 1998 resulted in a change of focus to accommodation of Finova's goals as opposed to pursuit of goals in the best interests of the Thaxton equity owners.

76.     The Firstplus acquisition completed the subjugation of Thaxton to Finova's goals, and at Finova's direction had transformed the companies as a whole as follows:

a.      Taken as a whole at the time of the acquisition, the Firstplus companies were overvalued by about $30 million;

b.      The purchase price did not provide a true fair market measure of value, because the transaction was not arm's length and did not involve the proverbial "willing buyer and willing seller".  This was because the decision to purchase was not Thaxton's – which stood to lose if the price was inflated – but Finova's, which intended to profit from the sheer size of the deal, but insulated itself from loss by passing the risk to Thaxton and Thaxton's investors, the subordinated note purchasers;

c.      The acquisition of the Firstplus companies resulted in about $30 million of goodwill being placed on the books of the combined Thaxton companies;

d.      Of the four Firstplus companies, only one, Southern Management, was an attractive acquisition target for a company like Thaxton;

e.      Since the Firstplus acquisition was 100% funded by Finova, the $30 million portion of the purchase price corresponding to goodwill resulted in an increase of debt to Finova in the amount of about $30 million.

f.      Because the $30 million goodwill that was placed on Thaxton's books at the time of the purchase did not reflect any real value, the net worth of Thaxton was overstated by that amount;

g.      In view of the fact that Thaxton's net worth was only a few million dollars at best (whether or not the $8 million of Finova "preferred stock" (described below) was included), from the moment that the Thaxton companies acquired the Firstplus companies, the overall Thaxton enterprise was insolvent by tens of millions of dollars;

h.      Given the history of Thaxton's marginal profits and the losses of new acquisitions including Budget and three of the four FirstPlus companies, there was no way that the tens of millions of negative net worth could be eliminated; thus, its continuing operations over the next several years did nothing beyond put off the inevitable, when Thaxton would be declared insolvent or voluntarily pursue a bankruptcy filing;

i.      Thus, Thaxton's bankruptcy filing in October, 2003 was the inevitable result of the Firstplus purchase at the beginning of 1999, at which point the Thaxton companies became tens of millions of dollars insolvent;

j.      From 1999 to September, 2003, the overall business plan of the Thaxton-Finova enterprise was to maintain an appearance of solvency and to use this appearance to sell subordinated notes; thus reducing the debt to Finova and rendering Finova better secured;

k.     Because of its insolvency, Thaxton could only continue in business by incurring more and more debt, which could be used to pay off existing debt;

l.     In short, from 1999 forward, Thaxton operated as the functional equivalent of a Ponzi scheme, incurring new debt from the note purchasers for the purpose of paying off the old debt at great profits before the eventual collapse of the company;

m.     Likewise, Finova and Berkadia operated the Thaxton companies as a "bustout" or, more accurately "bleedout" operation in contemplation of Thaxton's eventual but inevitable bankruptcy, where they used the good name and reputation of Thaxton and Jim Thaxton himself to lure more and more investors to put money into the enterprise while diverting the assets to themselves, and leaving Thaxton and Jim Thaxton as the "fall guys" to take the blame for Thaxton's default on the notes.

77.     By the time of Thaxton's bankruptcy, the Finova debt had been paid down by about $80,000,000.

78.     Frinova knew that its initial advance to Thaxton for the Firstplus acquisition was badly undersecured, and that Thaxton and, after the acquisition, the combined companies were consistently losing money.

79.     Finova's stated goal was to have Thaxton sell enough subordinated notes to render Finova's loan fully secured.

80.     From 1999 onwards, Finova's audits revealed to it that Thaxton's operations were losing money, even when its accounting showed otherwise.

81.     As late as 2001, even after many subordinated notes had been sold, Finova still considered itself to be insufficiently secured and wrote off over $31 million of the Thaxton debt, reserving an additional amount in excess of $5 million.

82.     In contrast, by 2003 (apparently after intensified efforts as a result of the Berkadia takeover, detailed below) Finova's plan was successful in that it considered itself to be sufficiently over-secured that it could put pressure on Thaxton to end the loan relationship entirely, even at the risk of a forced liquidation of Thaxton's assets.

83.     By September 2003, Finova had achieved its goals by earning something in the range of $65,000,000 in fees and interest from the Thaxton relationship and by having all of the undersecured portion of the loan paid off by sales of subordinated notes.

### Finova's role in the Note Sales Program

84.     Because Finova over-advanced on the loans to Thaxton, Finova had a risk of loss: Thaxton would not be able to find an alternative lender to take out the loan, and liquidation of Thaxton's assets would most likely produce insufficient returns to pay off the loan in full.

85.     As a result, one of Finova's priorities became the "de-leveraging" of the Thaxton loans, that is to say, reducing the "leverage" or amount of the Thaxton loan from Finova.

86.     Finova's plans called for the Thaxton loan to be deleveraged through the sale of subordinated notes.  Although this replaced debt with debt, it was subordinated debt which from Finova's standpoint was equivalent to equity.

87.     From the time of the Firstplus acquisition, Finova's plans included the sale of subordinated notes by Thaxton as an intrinsic part of its enterprise with Thaxton.

88.     As part of its initial review of the Firstplus purchase, Finova reviewed the note sales program and plans for increasing note sales in the areas where Firstplus had previously sold notes, and Ohio in particular.

89.     Finova took several steps to facilitate increased and continuing note sales.

90.     Finova allowed Thaxton to repurchase stock that had previously been sold to the public.  Although this decreased Thaxton's equity, it furthered Finova's purposes in several ways, including the following:

a.     Outside stockholders were not as beholden to Finova as was James Thaxton, so eliminating outside stockholders made it easier for Finova to dictate the policies of Thaxton;

b.     Because of the high debt to equity ratio that resulted from Finova's financing the expansion of Thaxton through loans, the stock of Thaxton never developed any real value or market, so buying back the stock pacified outside stockholders and also provided an artificially inflated stock price and a misleading picture of the value of the stock and the company;

c.     Outside stockholders were more likely to pressure Thaxton to pay dividends, but the enterprise as structured by Finova provided for nearly all surplus funds to be paid to Finova as interest and fees.

91.     From time to time, Finova made accommodations to Thaxton for the purpose of enabling the note sales to continue; these accommodations include but are not limited to the following:

a.     Although Finova had caused a new company, TIC, to be set up to accomplish the Firstplus acquisition, when it became evident that regulatory requirements would prevent Thaxton from reporting the entities separately, Finova agreed to allow the companies to be combined – at least on Thaxton's books;

b.     When losses in the RBE division threatened Thaxton's ability to sell notes, Finova financed the spin off with a loan to the startup company TLP, which had no assets or income.  Finova wrote the loan off in its entirety almost immediately, since it was unsecured, but Finova was able to get the note paid off later through note sales;

c.     Later, when Finova went bankrupt, Ohio regulators raised an issue about Thaxton selling notes whose terms extended beyond the term of the Finova note, so Finova executed a document indicating that it was extending the Thaxton term loan.

92.     One of the most significant actions Finova took was to execute documentation that was designed to make it appear to the public that Thaxton had an eight million dollar equity infusion from Finova, when in fact Finova never made an equity infusion into Thaxton.

93.     In general, the balance sheet of a business entity reflects assets and liabilities of the entity, and the arithmetically-calculated amount by which the assets exceed the liabilities appears as "net worth" or "total equity," or some similar entry, which may be composed of a variety of components, including, for example, par value of stock, but which must necessarily contain a calculated entry such as "retained earnings" which will result in the net worth reflecting the difference between assets and liability.  Balance sheet insolvency occurs when an entity's assets are less than its liabilities, and the net worth in such a case has a negative value.

94.     Under the foregoing accounting principles, when a lender makes a loan, the net worth of an entity does not change, because the loan increases cash assets but also increases liabilities by the same amount.  As time goes on, accrual of interest on the loan may result in a decrease in net worth unless the entity's operations are profitable and its assets increase.

95.     In contrast, the net worth of an entity may be increased if an investor either pays money for stock (increase in assets) or forgives debt in return for stock (reduction of liabilities).

96.     A stock transaction as described above may result in the issuance of stock to the investor, thus creating or adding to the investor's equity interest (generally increasing the investor's rights to distribution and control power), but the issuance of stock to an investor does not affect the net worth of a company unless the stock transaction is accompanied by an infusion of funds or forgiveness of debt.

97.     In 1998, Jim Thaxton requested Finova to purchase preferred stock in Thaxton.

98.     As Thaxton explained to Finova, a central reason for this request was to increase the net worth of Thaxton to assist in the sale of subordinated notes to the public.

99.     If Finova had done as Thaxton requested, it would have either paid money to Thaxton for stock, or it would have reduced the debt Thaxton owed to it.

100.    Finova instead structured a transaction that intentionally gave the appearance of a stock purchase, but did not actually increase Thaxton's net worth.

101.    In early 1999 Thaxton issued preferred stock to Finova in the nominal amount of $8 million.

102.    In its financial statements for the years 1999 – 2002 Thaxton showed on its books a reduction of the debt it owed Finova by $8 million, thus resulting in an increase in net worth in a corresponding amount.

103.    Without this $8 million adjustment to its books, Thaxton would have had very little equity in relation to its total assets in the years 1999 and 2000, and it would have been insolvent in the years 2001 and 2002.

104.    In fact, Finova structured the transaction so that it only moved the $8 million from one tranche of the Thaxton loan to another, and Finova neither paid money to Thaxton nor reduced the Thaxton debt in exchange for issuing the stock.

105.    In addition, because of the control Finova had over Thaxton as a practical matter, and because of the conditions placed on the issuance of the stock, Finova always retained the ability to force Thaxton to take back the stock (which would doubtless have been accounted for by moving the $8 million of debt from one tranche of the loan to another).

106.    In Finova's own words, it "allowed" Thaxton to characterize a portion of the debt as preferred stock in order to satisfy "covenants" with the noteholders.

### Berkadia Takes Over Control of Finova

107.    The dealings between and among Berkshire Hathaway, Leucadia, and Berkadia are not yet clear, but on information and belief their relations were such that the actions of each may be attributed to the other for purposes of this complaint, and during the relevant period they are therefore referred to collectively as Berkadia below.

108.    Finova, which went public in 1992, expanded aggressively during the next seven years and on information and belief the Thaxton transaction was not the only instance in which Finova's extensions of credit placed it at an immediate risk.

109.    Finova's stock prices peaked around 1998 (adjusted for splits).

110.    By 1999, it appears that the investing public began to sense problems with Finova's business, and the stock prices began to decline, doing so precipitously through the year 2000, and generating a number of shareholders' lawsuits.

111.    Apparently Finova's business struggles, coupled with its large assets, attracted the attention of both Berkshire Hathaway and Leucadia.

112.    Sometime in late 2000, Berkshire Hathaway began to purchase senior debt of Finova.

113.    On information and belief, Berkshire's analysis showed that even if Finova was not making money, it had sufficient assets that it could be profitably liquidated

114.    Around the same time, on information and belief, Leucadia began to negotiate with Finova concerning an equity infusion that would have given Leucadia control of the company, along with substantial financial incentives; this was incorporated into an agreement made public in November, 2000.

115.    In January 2001, Finova and Leucadia terminated their agreement.

116.    On information and belief, Berkshire Hathaway and Leucadia reached an agreement between themselves to form Berkadia and to liquidate Finova over time through a liquidating bankruptcy plan.

117.    In February, 2001, Berkadia entered into a new agreement with Finova, contemplating the reorganization of the company through a chapter 11 bankruptcy.

118.    On March 7, 2001, Finova filed a chapter 11 petition, obtained plan confirmation on August 10, and ultimately emerged from bankruptcy on August 21, 2001.

119.    Finova obtained confirmation of a plan substantially incorporating the terms of the February Berkadia agreement.

120.    On information and belief, Finova purported to be operating and managed as a debtor-in-possession independently exercising a fiduciary duty with respect to the creditors of Finova.

121.    On information and belief, in fact Finova was not independent, but rather under the control of Berkadia in 2001 during the time prior to and during the bankruptcy prior to confirmation of the plan, including the following:

a.    Berkadia reviewed proposed business decisions to be made by Finova;

b.    Finova made decisions referred to above only after obtaining approval from Berkadia;

c.    Finova provided Berkadia with access to confidential and proprietary information concerning Finova's business prior to and during Finova's bankruptcy, when such information was not available to other interested parties in the bankruptcy.

122.    Prior to the Finova bankruptcy, Berkadia was aware of the Thaxton debt, one of the largest single assets of Finova.

123.    Prior to the Finova bankruptcy plan consummation, Berkadia participated in the decision to extend the Thaxton note for the purpose of enabling Thaxton to continue to sell subordinated notes in Ohio.

124.    Prior to and during the Finova bankruptcy, on information and belief, Berkadia and Finova evaluated the Thaxton debt and determined that it should be liquidated as soon as possible by limiting Thaxton's ability to draw on its revolving line of credit and forcing Thaxton to turn to sale of subordinated notes in order to pay down the Finova debt.

125.    On information and belief, Finova and Berkadia knew or should have known that the above strategy almost certainly would lead to the eventual inability of Thaxton to repay its subordinated debt in full.

126.    Finova and Berkadia took affirmative steps to enable Thaxton to continue to sell notes by executing documentation indicating Finova would extend the maturity date of the Thaxton revolving line of credit.

127.    On information and belief, Finova, with authorization from Berkadia, knew that the documentation it executed would be provided to regulatory authorities and relied upon by those authyorities in permitting Thaxton to continue to sell notes in Ohio.

128.    Notwithstanding the foregoing, Finova and Berkadia implemented their strategy in 2001 by forcing Thaxton to cease drawing down the Finova line of credit and to embark on a course of action designed to sharply reduce Finova's exposure over the next several years and to allow Finova to exit from the relationship by the end of 2003, even if that meant liquidation of the assets of Thaxton.

129.    Finova and Berkadia failed to disclose to regulatory authorities that the foregoing was the true plan, and that the documentation regarding the extension of Thaxton's line of credit was misleading under the circumstances.

130.    On information and belief, from February of 2001 forward, Berkadia participated in all major decisions of Finova with respect to the Thaxton loan.

131.    Around this time in 2001, Finova recognized that Thaxton was in violation of some of the loan covenants; however, Finova did not take any action, except to use its power over Thaxton to continue to force Thaxton to sell notes.

132.    Around 2001, Finova determined that not only had it loaned 100% against the Thaxton assets under its over-advance facility, but it was probably under secured and in risk of loss in the event of a liquidation.

133.    Finova had also determined as early as 1999 that there were discrepancies in the manner by which Thaxton wrote off bad debt, so that Thaxton was inflating the value of its consumer loan portfolio, but Finova had allowed Thaxton to continue in business notwithstanding the foregoing, since otherwise Thaxton would have gone out of business resulting in a loss to Finova;  additionally, on information and belief, during that period Finova was inflating its own assets in its reports to its own bankers and other lenders.

134.    As a result of its bankruptcy, Finova no longer had to conceal its own losses, so it wrote off approximately $31 Million of the Thaxton debt and reserved more than $5 million in addition, and also placed the Thaxton loan on non-accrual status.

135.    From that time to the present, through the note sales program, Finova has received $80 million paydown of its loan, making it purportedly fully secured, and it has also received about $45 million in fees and interest from Thaxton, providing it with a significant profit.

136.    Finova established a "special reserve" that limited Thaxton's ability to draw on its line, reserving about $23 million of the line with the result that when the reserve was put into effect Thaxton was left with virtually no available credit at all.

137.    Finova's bankruptcy plan resulted in its reorganization, with the controlling interest in the reorganized company sold to Bercadia, which provided Finova with a new business plan, limited to the liquidation of Finova's assets.

138.    Around that time, Finova ceased making any more loans, and it took steps to cause Thaxton to cease all draws upon Thaxton's line of credit, even though Thaxton reported the availability of credit in its public filings.  These steps included, but were not limited to the special

reserve referred to above, which sent Thaxton the message that Finova could deny all further requests for draws and that Thaxton would be unable to do anything about it.

139.    In the spring of 2001, to address the concerns of Ohio regulators, who felt that Thaxton should not sell five year notes that extended beyond the time the Finova note came due, Finova executed a loan amendment documented in a  term sheet extending the maturity of the Thaxton loan.

140.    Finova did not comply with the above term sheet.

141.    In actuality, the amended loan agreement was used by Finova to change its relationship with Thaxton and to force an aggressive paydown of the Finova loan.

142.    In view of the actual dealings of the parties to the Finova-Thaxton loan, it operated as an amortizing loan rather than as a revolving line of credit.

143.    Characterizing the amortized payoff of the loan as a revolving line of credit was misleading to potential investors, and therefore constituted a misrepresentation when presented to securities regulators.

144.    Because Thaxton was not allowed to draw on its purported line of credit, it began to hoard cash, resulting in higher interest payments and losses due to poor cash management.

145.    The rapid amortization of the loan could only be accomplished through the aggressive sales of subordinated notes.

146.    A significant part of the business of Thaxton and its subsidiaries began to be devoted to nothing more than the sale of subordinated notes.

147.    As set forth more fully below, Thaxton utilized billboards, flyers, newspaper ads, and posters in branch offices to promote the note sales.

148.    Thaxton did not provide prospectuses to note purchasers in advance of the sales.

149.    Thaxton provided its sales personnel with a script to use in the sales of notes.

150.    The script contained false and misleading information, as set forth below.

151.    Thaxton paid bonuses and incentives to its employees for their success in selling notes, in violation of the securities laws.

152.    Many business decisions of Thaxton were driven by the need to continue note sales.

153.    For example, when the company's special insurance division was not profitable, it was spun off as "Thaxton RBE" in order to meet earnings requirements for Thaxton imposed by state regulators.

154.    The centerpiece of Thaxton's note sales was to appeal to retired persons and other less sophisticated investors who normally would keep their money in banks and who had no interest in making speculative investments.  To accomplish this, Thaxton's ads compared the notes with bank products, such as CDs, they provided for daily notes and continual "account" activity, they advertised the availability of IRAs and retirement accounts, and they characterized Thaxton offices as "financial centers.  The upshot was that noteholders thought that they were buying something that was equivalent to a bank CD.

155.    By the summer of 2003, the situation was this:

a.    Thaxton had expanded enormously, generating fees to Finova in the range of $65 Million;

b.    Thaxton had reported some small profits, but because of under-reporting loan portfolio losses it probably never enjoyed true profits;

      c.     Finova had financed Thaxton's expansion by lending up to about $190 Million on a total credit facility of $250 million;

      d.     Finova had discovered hidden losses, considered itself under secured, and forced Thaxton to sell notes in the total amount of about $120 Million;

      e.     Notes sales allowed Thaxton to pay down the Finova debt by $80 Million, to a balance of about $110 Million, where Finova had adequate security for its loans and could expect to be paid out in full in the event of Thaxton's insolvency;

156.    After Thaxton had reduced the Finova debt, Finova planned to force Thaxton to end the relationship. Finova's plans called for the Thaxton loan to be terminated by the end of 2003.

157.    In response to the increased pressure from Finova to exit the loan (even though the term had ostensibly been extended) Thaxton sought a take-out loan from Bank of America.

158.    Bank of America considered lending to Thaxton; however, in doing its due diligence Bank of America discovered Thaxton's assets were inflated and that the profits it had recently reported were actually losses; as a result, Bank of America terminated its consideration of the loan.

159.    As a result of this discovery of accounting problems by a third party, Thaxton was constrained to restate its most recent financial statements, and to stop its note sales program and its payments on the notes.

160.    Finova then forced Thaxton into a chapter 11 voluntary bankruptcy, anticipating that as a result of the paydown of the Finova debt by the years of note sales, Finova would now be comfortably secured and would be paid out in full, in accordance with Finova's business plan of rapid liquidation of its holdings.

161.    Thaxton filed for chapter 11 protection on October 17, 2001, and since that time the plaintiffs have not been paid any money on account of their notes and because of Thaxton's bankruptcy have been unable to take any actions to collect their notes from Thaxton, other than by filing proofs of claim in the Thaxton bankruptcy.

### DAMAGES

162.    The noteholders have not been paid continuing interest on their notes and have been unable to redeem them, for total present losses to the subordinated noteholders in the range of $123,000,000, together with postpetition interest.

163.    The subordinated noteholders have been unable to recover any of their money through the bankruptcy proceedings.

164.    A recent settlement of claims against professionals who assisted Thaxton is expected to result in a partial recovery of their losses in an amount in the range of 5 to 10% of their total losses, depending on the costs of that action, the fees awarded, the costs of administering the claims, and the decision of any note purchasers to opt out of the settlement; however the noteholders have not yet received any proceeds from the settlement and as of today have lost all of their money.

165.    The note balances of the individual plaintiffs herein are set forth on Exhibit A attached hereto.  This exhibit is derived from records maintained by Thaxton and may contain some scriveners' errors.

166.    On information and belief the losses of the plaintiffs herein are liquidated in an amount equal to their note balances including accrued interest as of the date of the Thaxton bankruptcy, and plaintiffs are therefore entitled to prejudgement interest at the statutory rate in South Carolina as of October 17, 2001, that is, 8 3/4 %.

167.     Based on the foregoing, the total loss of all noteholders, including prejudgment interest and allowing for the anticipated recovery from the settlement with the professionals, is in the range of $153,000,000.

168.     The total loss of the plaintiffs herein is in the range of $84,000,000.

169.     On information and belief, principles of marshaling of assets may apply such that the plaintiffs should recover their claims in the fullest extent possible from the defendants herein in order that the recovery of all noteholders, including the plaintiffs, may be maximized through the bankruptcy.

170.     Plaintiffs are also entitled to punitive damages in an amount appropriate for each defendant.

171.     Plaintiffs are also entitled to twice treble damages as set forth below.

172.     In addition, under some causes of action plaintiffs are entitled to reasonable attorneys' fees and costs of this action.

### UNDERLYING VIOLATIONS BY THAXTON ENTERPRISE

173.     The defendants in this case are liable to the plaintiffs among other reasons  because of their roles in Thaxton's sales of notes to the plaintiffs;  accordingly, although no causes of action are stated against the Thaxton Companies themselves, the violations by Thaxton are underlying violations that may be imputed to the defendants, as follows.

**THAXTON'S FIRST VIOLATION**

*(Violation of Section 11 of the Securities Act of 1933,*

*Misrepresentations and Nondisclosures in Registration Statement)*

The allegations of the preceding paragraphs are realleged as if incorporated herein verbatim.

174.    Section 11 of the Securities Act of 1933 provides for a private right of action when a federal registration statement of a security contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, at the time the relevant part of the registration statement became effective.

175.    The notes at issue in this case constituted securities as defined by the United States and South Carolina securities laws.

176.    Thaxton utilized instruments of transportation and communication in interstate commerce as well as the United State mails to sell the securities.  Among other things, Thaxton's sales method involved the mailing of the signed note to each purchaser after the purchaser had provided payment to Thaxton.

177.    Thaxton apparently filed registration statements with the SEC as early as 1995, and since that time has periodically updated those registration statements or filed new registration statements.

178.    All of the registration statements by which notes were sold to purchasers of Thaxton notes, and related documents contained various statements of material fact that were untrue at the time they were made, including but not limited to the following:

        a.    The statements of net worth for Thaxton included as one of the assets of Thaxton about $1.3 Million in goodwill as part of the purchase price of Budget Financial,

when in fact Finova had forced Thaxton to purchase Budget in 1998 to avoid a probable loss on Finova's loan to Budget, Budget was not profitable and operated in states that were undesirable from a regulatory standpoint for the consumer loan business Budget was in, and the so-called goodwill should properly have been regarded as a fee Thaxton paid to Finova, and not as an asset;

b.      From the time of Thaxton's purchase of FirstPlus in 1999, the statements of net worth for Thaxton included as one of the assets of Thaxton about $30 Million in goodwill as part of the purchase price, when in fact the value of the acquisition was over-stated by at least that much;

c.      During the course of its operations prior to the summer of 2003, Thaxton routinely overstated its assets and earnings by failing to properly charge off questionable debts; the precise amount at each point in time remains to be seen, but it appears Finova noted the need to charge off some of the debt as early as 2001, when it internally wrote off $31 Million of the Thaxton loan.  Bank of America discovered the accounting discrepancies in 2003 when it refused to make a takeout loan to Thaxton, and the amount of the understated bad debt has been reported by Peter Hoffman in the bankruptcy to have risen to as high as $16 Million;

d.      Thaxton consistently characterized the note sales program as being designed to obtain the funds it needed (for lending) at a lower interest rate, whereas the true driving force behind Thaxton's note sales program was to "delever" Finova and to comply with Finova's demands that its exposure be reduced;

e.      The relationship between Thaxton and Finova was characterized as that of borrower-lender, whereas in fact Finova exercised significant control over the affairs of Thaxton and should have been identified as a co-venturer, control person, partner, or otherwise as being the true party in interest in the growth and operations of Thaxton;

f.      Thaxton indicated that there was significant credit available on the Finova line of credit, even after Finova took steps in 2001 resulting in Thaxton ceasing all draws on the line;

g.      Thaxton indicated accurately that the Thaxton stock was thinly traded, but falsely represented that there were sales at the $10 per share level, when in fact those sales were not arms length sales and should not have been reported – moreover, they were repurchases of Thaxton stock using funds advanced by Finova for the purpose of creating a false appearance of a significant value for the stock and the existence of considerable equity in Thaxton;

h.      Thaxton reported that Finova held $8 Million of preferred stock in Thaxton, when in fact the "preferred stock" was in fact nothing more than a dressed-up loan from Finova to Thaxton;

i.      Thaxton represented that some notes would be sold by Carolinas First Investments under the control of James Garrett, when in fact Garrett assisted Thaxton in the sales program but did not sell notes as an independent broker/dealer;

j.      There was no meaningful disclosure of the $23 Million reserve imposed by Finova against Thaxton's line resulting from Finova's determination that Thaxton's assets were overstated by under-reporting of bad loans.

179.     In addition, the registration statements and related documents failed to disclose numerous matters that under the circumstances needed to be disclosed to make the statements not misleading, including but not limited to the following:

a.     Thaxton failed to disclose the true relationship between Finova and Thaxton, as set forth above;

b.     Thaxton failed to disclose the motivation behind the merger of Thaxton and TIC, namely, to comply with regulatory requirements in order to continue note sales;

c.     Thaxton failed to disclose the fact that the 2001 loan modification and extension was motivated by the need to satisfy regulators so that note sales could continue;

d.     Thaxton failed to disclose the fact that after 2001 Thaxton ceased drawing on the Finova line of credit;

e.     Thaxton's description of its business was misleading because it mentioned the loan and insurance businesses, but failed to disclose that a significant part of the companies' activities revolved around the sale, processing, and renewal of notes under its note program;

f.     Thaxton failed to disclose financial and other incentives paid to employees for selling notes – such incentives being violations of the securities laws;

g.     Thaxton failed to disclose that for all relevant times it was most probably insolvent;

h.     Thaxton failed to disclose the fact that of all its loan operations, only the one operating under the name "Southern Management" enjoyed significant profits; in fact, the

Thaxton loan company "TICO" and the other three loan companies acquired in the FirstPlus transaction, as well as the Budget Finance companies, were all unprofitable;

i.      Thaxton failed to disclose the motivation for the spin-off of RBE was to satisfy earnings requirements imposed by regulators;

j.      Thaxton failed to disclose the fact that Carolinas First Investments had been a company owned by Thaxton known as Thaxton Securities, and had been given to a Thaxton employee, James Garrett, for purely nominal consideration in 1998 in order to create the appearance of an independent broker/dealer to comply with securities requirements of certain states;

k.      Thaxton failed to meaningfully disclose the fact that it depended on the continuing sales of notes to continue in business, and that the note sales program, like a Ponzi scheme, depended upon ongoing sales, without which it would come crashing down;

l.      The registration statements and related documents failed to disclose to regulators many of the details of the note sales program, including the content of advertising material and sales scripts used in sales and that made improper and untrue representations;.

180.    In the foregoing respects, the Thaxton note sales program involved untrue statements and omissions of fact giving rise to a right of action under Section 11 of the Securities Act of 1933.

**THAXTON'S VIOLATIONS OF BANKING LAWS**

181.    Thaxton's sale of demand notes directly to thousands of investors through its branches constituted the unlawful taking of deposits by an entity not regulated as a bank and that Thaxton, in essence, was illegally operating as an unlicensed bank in violation of the Glass-Steagall Act, 12 U.S.C. § 378(a)(2).

182.    Thaxton's sales program involved numerous false and misleading devices designed to give the impression that it was the equivalent of a bank, and also to allow it to actually function as the equivalent of a bank.

183.    Functionally, Thaxton operated like a bank in numerous ways, including but not limited to the following:

a.    It made consumer and commercial loans;

b.    It accepted time deposits, that is, through note sales it allowed the public to deposit funds in amounts determined by the note purchasers;

c.    It accepted demand deposits, that is, by selling daily notes that could be purchased in any size and could be redeemed at any time on demand and without penalty;

d.    It allowed all notes to be redeemed at any time, even if they were term notes;

e.    It often allowed notes to be redeemed in advance of their term without penalty;

f.    It allowed existing notes to be increased through the deposit of additional funds;

g.    It allowed note holders to withdraw money without cashing in notes, by withdrawing a portion of the deposit and leaving the remainder;

h.    Note purchases, or deposits, were accomplished at Thaxton branches;

i.    Note purchases, or deposits, were not sold through brokers (except in special cases where Thaxton's captive broker, Jim Garrett became involved);

j.    Notes, or deposits, were in the name of the individual purchasers and were not freely transferable or saleable on securities exchanges or over the counter;

      k.      Withdrawals could be accomplished on the spot at Thaxton branches;

      l.      Thaxton provided access to other financial services, such as retirement accounts, IRA's, and 401-k's (although it did not actually provide those itself).

184.    In addition to functioning as a bank, Thaxton marketed the notes in a manner designed to mimic bank operations, including but not limited to the following:

      a.      The notes were compared to CD's;

      b.      Bank software was used to report account information to note purchasers;

      c.      Thaxton used the word "account" to describe the note purchase arrangements;

      d.      Paperwork for the notes included expressions such as "account", "deposit", withdrawal" and "CD" ;

      e.      Thaxton's marketing plans for the sale of the notes, which were in Finova's files, reveal that the notes were designed to have the features of bank certificates of deposit or savings accounts in order to appeal to individuals who kept their savings in bank accounts;

      f.      Thaxton chose interest rates that we just slightly higher than bank CD rates, in order to make the investments seem similar;

      g.      Thaxton used billboards,  flyers and other advertisements to sell notes, and often did not use prospectuses at all, or only delivered prospectuses after note purchases, so that the general impression it gave to the public was that it was operating like a bank.

185.    Key to the success of the note sales program was the promise that they were redeemable on demand.

186.    The promise of demand redeemability was a fraud and never could have been made if Thaxton had submitted itself to the supervision of bank regulators.

187.    While Thaxton promised that the notes could be redeemed at any time, Thaxton never submitted itself to the scrutiny of the governmental regulators who oversee the only institutions permitted to take demand deposits, i.e., banks.

188.    Finova had notice of the demand features of the demand notes that made them deposits and of Thaxton's plan to make the notes look like certificates of deposit to appeal to bank ,savers, but, nevertheless, encouraged note sales and assisted note sales, such as by designing the preferred stock transaction described above.

189.    The Glass-Steagall Act, 12 U.S.C. § 378, makes it illegal for an entity that is not both authorized to accept deposits and audited as a bank to accept deposits subject to repayment at the depositor's request:

> it shall be unlawful... [f]or any person, firm, corporation... to engage, to any extent whatsoever with others than his or its officers, agents or employees, in the business of receiving deposits subject to...repayment...upon request of the depositor, unless such person firm, corporation... [shall be authorized to conduct such business and be audited by bank regulators.]

(12 U.S.C.A §378(a)(2))

190.    The Glass-Steagall Act makes it unlawful for a 'person ... to engage, to any extent whatsoever... in the business of receiving deposits. *U.S. v. Jenkins*, 943 F.2d at 174 (affirming conviction of individual offering to accept funds to be deposited in non-existent bank in Africa).

191.    Thaxton's sale of notes involved the receipt of monies from the note-purchasers based upon a promise that the funds could be redeemed at any time. As a result, Thaxton was engaged in the business of receiving deposits in violation of 12 U.S.C. § 378(a)(2).

## FINOVA'S ROLE AS CONTROLLING PERSON

192.    As set forth above, Finova's relationship with Thaxton was in many cases one of a joint venture or partnership.

193.    Finova sought to earn larger and larger fees and interest from Thaxton, and saw Thaxton's growth as an opportunity to enlarge its own lending business.

194.    Because this growth needed to be funded, Finova was willing to fund it through the over-advance facility, but it wished to limit its exposure in the future by ensuring that Thaxton sold subordinated notes to "deleverage" Finova, that is, to bring the total Finova debt down to a level Finova felt provided a comfortable equity cushion.

195.    Because of the foregoing, Finova and Thaxton had an interest in working together, each to achieve its own purposes.

196.    In the course of their relationship, since Thaxton could only expand with funding provided by Finova, Finova began to dominate the relationship.

197.    Finova's control over Thaxton's affairs sprang from several sources, as follows:

a.    Finova purported to be a shareholder in Thaxton, holding $8 Million in preferred stock, representing in excess of 10% of all equity based on book value and apparently representing a much larger percentage of actual paid-in cash equity;

b.    Finova's loan documents gave it power to keep track of Thaxton's business and to withhold approval for many business decisions;

c.      Finova's loan documents gave it power to dictate Thaxton's choice of accounting methods;

d.      At times Thaxton was technically in default on its loans, but Finova was able to waive those defaults in return for Thaxton's agreement to comply with Finova's other demands;

e.      Whether or not Thaxton was actually in default, Finova had the power to withhold funds from Thaxton based upon a claim of non-performance;

f.      Finova's agents developed a personal relationship with James Thaxton that turned into an everyday working relationship whereby each consulted the other on a routine basis and James Thaxton came to depend on Finova's input for all significant decisions, and only took significant action based upon approval from Finova;

g.      The level of guidance from Finova reached the point where Thaxton looked to Finova to provide reliable guidance for all major decisions;

h.      Finova dominated the relationship and controlled Thaxton's business to such an extent that a fiduciary relationship developed between the companies.

198.    Finova had the ability to control the actions of Thaxton and actually did control Thaxton's actions.

199.    The fact that Finova controlled Thaxton is demonstrated by various facts, including the following:

a.      Finova caused Thaxton to purchase Budget Finance in 1998 for about $3,010,000. In fact, Budget had true assets of only about half that much. However, Budget owed money to Finova and by causing Thaxton to purchase Budget at an inflated price Finova avoided significant losses from Budget. In assuming the Budget liability Thaxton

in effect was being forced to pay Finova an enhanced charge or fee in return for Finova's willingness to continue to lend money;

b.      During the time Finova was pursuing its own plan to expand its RDF facility lending to consumer finance companies, Finova caused Thaxton to expand aggressively;

c.      Finova drove the structuring of the FirstPlus LBO by causing Thaxton to create a separate company and enabling him to fund the purchase – even utilizing Thaxton funds to fund the new entity – based upon Finova's own lending restrictions that limited the amount it could lend to a single entity;

d.      Finova elected to liquidate its note in 2001, and after December 2001 it prevented Thaxton from ever drawing down on the Finova line of credit, even though the line of credit ostensibly had more credit available;

e.      Finova did due diligence for Thaxton on various acquisitions and in effect made the decision for Thaxton as to what acquisitions it should make, while Thaxton did not do independent due diligence;

f.      Finova caused Thaxton to pursue the note sales program more and more aggressively, from the time Finova first allowed Thaxton to purchase assets using 100% financing under the Finova over-advance facility, and even more so after Finova wrote down the Thaxton note $31,000,000 and felt an increased need to "deleverage" the debt;

g.      Finova caused Thaxton to continue expansion efforts, even though James Thaxton's personal assets and income from Thaxton were limited and much of his own profits were plowed back into the company, while during the same period Finova was able to cause Thaxton to pay it fees and interest in the range of $65 Million.

200.    In short, the role played by Finova was not that of a passive lender protecting its interest by refusing to make a loan or by calling an existing loan; rather, Finova became an active partner and counselor to Thaxton who took a leading role in most of Thaxton's major business decisions, and that encouraged and was fully aware of the note sale program designed to transfer the risky portion of the Finova debt to the unsuspecting noteholders, even though Finova had already internally written down a significant portion of that same debt as potentially uncollectible.

## THE ROLE OF BERKADIA, LEUCADIA, BERKSHIRE HATHAWAY, AND THOMAS MARA AS CONTROLLING PERSONS

201.    After confirmation of Finova's bankruptcy plan, Berkadia owned 50% of Finova's stock and managed Finova pursuant to a management agreement.

202.    Even before the plan was consummated, beginning on information and belief in February, 2001, the parties anticipated the effectuation of the bankruptcy plan along lines similar to those actually adopted in the plan, and as a result Berkadia and related parties were given the authority to make decisions concerning Finova.

203.    For example, e-mails disclose that Tom Mara was engaged in reviewing and approving business decisions of Finova before he or Berkadia had any contractual right to do so.

204.    Tom Mara personally traveled to Lancaster to meet with Thaxton in connection with forcing Thaxton to agree to less favorable contract terms on the loan.

205.    Berkshire Hathaway and Leucadia own Berkadia jointly, and thus both share control power over Finova.

206.    Mara is the CEO of Finova, and as such is a controlling person.

**FOR A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS**

*(Control Person liability for violation of Section 11 of the Securities Act of 1933,*

*15 U.S.C. § 77k, pursuant to Section 15 of the Securities Act of 1933 15 U.S. C. §77o)*

The allegations of the preceding paragraphs are realleged as if incorporated herein verbatim.

207.    As set forth above, Thaxton violated Section 11 of the Securities Act and damaged the noteholders by selling them risky notes and causing losses.

208.    Finova was a controlling person of Thaxton.

209.    Since 2001, the other defendants have been controlling persons of Thaxton, directly and indirectly through Finova.

210.    Not only were Finova and the other defendants controlling persons of Thaxton; they exercised control directly over matters involved in Thaxton's false and misleading registration statements, including but not limited to the following:

      a.    Jim Thaxton had asked Finova for an equity infusion, but it was Finova that actually structured the deal so that, in Finova's own words, it "allowed" Thaxton to "characterize" a portion of the debt as equity in order to sell notes – while keeping the $8 million Thaxton listed as equity as part of the note and therefore part of the debt;

      b.    The decision to create TIC as a separate company was Finova's, designed to defraud its own bankers and, as a consequence, also causing the Thaxton company's reporting to be misleading;

      c.    The decision to acquire the FirstPlus company's was Finova's, rendering the Thaxton companies insolvent;

      d.    Jim Thaxton asked for an extension of the Finova note, which was granted by Finova.  Then the other defendants became involved and reneged on the agreement,

causing Thaxton to enter into an amended term sheet calling for the paydown of the loan, and also effectively terminating all availability under the revolving line of credit.

e.    On information and belief, once the Berkadia defendants became involved, the decision was made to liquidate the Thaxton loan, which because of the insolvency of the Thaxton companies meant driving Thaxton into bankruptcy after as much money had been wrung out of note purchasers and passed through to the defendants.

211.    As a result, Finova and the other defendants are liable to the noteholders the same as Thaxton, pursuant to Section 15 of the Securities Act of 1933, 15 U.S. C. § 77o.

## FOR A SECOND CAUSE OF ACTION AS TO ALL DEFENDANTS

### *(Unfair Trade Practices, S.C. CODE ANN. § 39-5-10 et seq.)*

The allegations of the preceding paragraphs are realleged as if incorporated herein verbatim.

212.    Finova was a control person of Thaxton, and aided and abetted Thaxton in conducting a business in the State of South Carolina in violation of the South Carolina Unfair Trade Practices Act, as set forth below.

213.    On information and belief, to the extent the note sales program was not a business carried on in the State of South Carolina or originating in the state of South Carolina, the defendants and Thaxton violated equivalent laws in such other state as may be determined to have been Thaxton's place of business for purposes of this cause of action.

214.    The enterprise described above involved the infusion of a large amount of money into the Thaxton companies by Finova, creating apparent liquidity, so that Finova could earn large profits on the money it loaned, and also so that it could be paid back out of the insolvent entity it created through the sale of notes to third parties – the plaintiffs.

215. Because of the underlying insolvency of the Thaxton companies as put together by Finova, it was unlikely as a practical matter that they could ever repay their debts to both Finova and subordinated note purchasers in full, so that the only way the Thaxton companies could remain in business and continue to satisfy payoff demands was to continue to generate new debt to pay off the old debt.

216. Until 2001, Finova, and, thereafter, Finova together with Berkadia and its affiliates, individually commited, participated in, directed, and authorized commission of violation of the South Carolina Unfair Trade Practices Act, as set forth below.

217. Finova and Berkadia engaged in and committed a variety of unfair trade practices, including but not limited to the following:

a. Finova and, after early 2001, Berkadia and its affiliates caused and contributed to Thaxton's operations mimicking those of a legitimate bank, but without the added security of federal or state bank regulation and insurance, whereby Thaxton made loans and took deposits and offered a variety of financial instruments, including IRA's and 402-k's, as well as demand deposits, giving potential investors the impression that investing in Thaxton was approximately equivalent in risk to putting money in the bank, all of the foregoing in violation of the Glass-Steagall Act;

b. Finova caused and, after early 2001, Berkadia and its affiliates caused and contributed to Thaxton's operation of a Ponzi scheme or "pyramid club" in violation of the South Carolina Unfair Trade Practices Act, S.C. Code § 39-5-30, which provides that "[a]ny contract or agreement between an individual and any pyramid club, or other group organized or brought together under any plan or device whereby fees or dues or anything of material value to be paid or given by members thereof are to be paid or given to any other member

thereof, which plan or device includes any provision for the increase in such membership through a chain process of new members securing other new members and thereby advancing themselves in the group to a position where such members in turn receive fees, dues or things of material value from other members, is hereby declared to be an unfair trade practice pursuant to § 39-5-20 (a) of the South Carolina Unfair Trade Practices Act of 1971," because the actual business of Thaxton created large cash flow but did not produce any profits, so that the investment activities of Thaxton in reality consisted of later investors – purchasers of notes – investing money in the expectation of realizing enhanced gain through interest payments, which gain could only be achieved through the sale of more and more notes.  As the first investor in the scheme, Finova's goal was to be the first investor out as well, recouping its investment with profits and leaving later investors – note purchasers, to be left with losses when Thaxton's unprofitable business venture became apparent.

c.    Thaxton under the control of Finova and, later, Berkadia, engaged in unfair competition and trade by selling notes to investors, the plaintiffs herein, by giving the false impression that the notes were similar to and approximately the same risk as the risk of investments in bank CDs, while paying somewhat more in interest, with the result that plaintiffs invested their money without being aware of the high degree of risk and the fact that the underlying purpose of the note sales was to replace Finova and Berkadia's investments with the investments of the note purchasers.

d.    Finova and Berkadia, together with Finova, acted as the controlling persons and aiders and abettors in causing Thaxton to operate illegally as a bank without complying with banking laws and in criminal violation of the Glass-Steagall Act, and, similarly, Finova and the other defendants acted as illegal bank holding companies.

218.     On information and belief, Defendants knowingly and intentionally engaged in the above acts.

219.     The actions above had an adverse impact on the public in South Carolina by harming numerous note purchasers, including but not limited to the plaintiffs herein.

220.     On information and belief these acts were capable of repetition and were in fact repeated thousands of times, based upon the fact that Defendants engaged in similar deceptive acts previously.

221.     As set forth more fully above, these actions proximately damaged Plaintiffs.

222.     The foregoing constitutes a violation of the South Carolina Unfair Trade Practices Act, and Defendants are jointly and severally liable to Plaintiffs for the resulting actual and consequential damages in the amount of approximately $84,000,000 as set forth more fully above, together with treble damages in the range of $252,000,000, reasonable attorneys' fees, and costs of this action, pursuant to S.C. CODE ANN. § 39-5-140.

### FOR A THIRD CAUSE OF ACTION AS TO ALL DEFENDANTS

#### *(Civil RICO, 18 U.S.C. § 1961 et seq.)*

The allegations of the preceding paragraphs are realleged as if incorporated herein verbatim.

223.     Each of the defendants is a "person" as the expression is used for purposes of the civil RICO statutes.

224.     In 1998, Finova caused The Thaxton Group and James Thaxton to become involved with an enterprise with Finova whose purpose was earning profits for Finova.

225.     The enterprise was an unincorporated association in fact that was partially but not fully defined by the loan agreements between Thaxton and Finova.

226.    The actual makeup of the enterprise changed somewhat over time, but at all times it involved Finova on one hand and, on the other hand, Jim Thaxton and The Thaxton Group, together with various affiliates, subsidiaries, and associated parties, including but not limited to the following:

a.    At the time of the Firstplus acquisition, Finova caused Jim Thaxton to create a new company, TIC, which was set up with a separate corporate charter but as a practical matter was operated as a continuing part of the same enterprise, and eventually moved into Thaxton in late 1999

b.    In 1998, Thaxton used a subsidiary, Thaxton Securities, to satisfy regulatory requirements that a broker be involved in note sales in North Carolina (and, later, other states).

c.    When it appeared that there were additional, insurmountable regulatory hurdles to having a subsidiary perform such a function, Thaxton Securities was ostensibly sold to Jim Garrett, a Thaxton employee, who then operated Thaxton Securities under the name Carolinas First Investments, together with another company of his, Carolinas First Financial; however, Garrett and Carolinas First remained part of the enterprise and spearheaded the note sales program.

d.    Later, just before Finova went bankrupt, Leucadia, Mara, Berkshire Hathaway, and Berkadia identified the ability to make profits by becoming involved in the enterprise, and joined in as co-conspirators, aiders and abettors, and controlling persons of Finova in 2001.

227.    Notwithstanding some changes in membership, as set forth above, there was a general continuity of the enterprise form the end of 1998 to the date of Thaxton's bankruptcy in 2003. The

purpose of the enterprise was to profit Finova and those associated with Finova, and in particular its purpose was to operate Thaxton after the manner of a Ponzi scheme, by earning high fees and interests off Thaxton through loans from Finova and then transferring the loss to third parties through the sales of subordinated notes.

228.    In part, the activities of the enterprise were lawful. The overall relationship between Finova and Thaxton was in the nature of a joint venture by which Thaxton carried out the business of acquiring and operating consumer finance companies and other legitimate businesses, and Finova financed Thaxton's operations. However, in accomplishing those goals Finova dominated Thaxton and forced Thaxton and the joint enterprise to engage in a pattern of racketeering activity.

229.    The activities of Finova, Thaxton, and related parties involved interstate commerce, because Finova is from outside of South Carolina and Thaxton's principal place of business is in South Carolina, because many of the notes were sold across state lines, and because federal securities law and federal bankruptcy law were implicated in the activities of the enterprise.

230.    Finova itself, together with Berkadia, Berkshire Hathaway, Leucadia and Mara, conducted and participated directly and indirectly in the enterprise's affairs by operating and managing the enterprise with respect to major decisions.

231.    The racketeering acts of the enterprise form a pattern because they are related, having the same or similar purposes, results, participants, types of victims, and method of commission, in that over a period of over five years under the direction of Finova Thaxton, and other defendants and associated parties worked together and conspired to transfer money from plaintiffs' personal savings and bank accounts, through Thaxton, to benefit Finova and related defendants, using threats and extortion to force Thaxton to participate in the scheme, and using mail fraud, wire fraud, bank fraud, and extortion to obtain the funds, and draining Finova and Thaxton of their money by transferring

it to the Berkadia defendants in contemplation of the eventual bankruptcies of Finova and Thaxton, thereby committing bankruptcy fraud.

232.    This pattern of fraud continued over a period of nearly five years, beginning at the start of 1999 and continuing through Finova's bankruptcy in 2001 and ending with Thaxton's bankruptcy toward the end of 2003.

233.    On information and belief Defendants intentionally violated 18 U.S.C. § 1962 in various ways, including:

   a.    Violations of Section (a) by misreporting the nature of the Thaxton transactions to their lenders to obtain funds through bank fraud;

   b.    Violations of Section (b) by using funds obtained through bank fraud and by using extortionate threats to acquire a controlling interest in the enterprise;

   c.    Violations of Section (c) by conducting and participating in the conduct of the enterprise's affairs through a pattern of racketeering activity, including the setting up of the enterprise in order to commit bank fraud by disguising the size of the loan to the Thaxton companies as a unified entity; extortionate threats utilizing fear of damage to the business and reputation of Thaxton and economic ruin of the investors in Thaxton to force the Thaxton companies to comply with the demands of Finova and the enterprise; and bankruptcy fraud, both by hiding what they judged to be the true assets of Finova in the Finova bankruptcy and by transferring valuable assets of Thaxton to the enterprise in contemplation of the Thaxton bankruptcy, in what is commonly called a "bustout" or "bleed-out" scheme;

   d.    Violations of Section (d) by conspiring together to accomplish the ends of the enterprise through the joint efforts of the various Defendants;

All of the above as set forth more fully below.

234.    The above pattern of racketeering activity damaged Plaintiffs as set forth above.

235.    The foregoing constitutes a violation of the Civil RICO statutes, as a result of which Plaintiffs are entitled to actual damages, together with treble damages, reasonable attorneys' fees, and costs and disbursements of this action, pursuant to 18 U.S.C. § 1964 from the defendants, jointly and severally.

### *Preliminary Rico Case Statement*

236.    The following allegations set forth additional facts that would be responsive to the questions asked for in the RICO case statement originally designed by the Honorable G. Ross Anderson, Jr., and more recently adopted by many other courts in the District. The following is provided for the convenience of the Court and the parties, but Plaintiffs reserve the right to augment this statement if the Court directs that a Case Statement be filed. For convenience, the section numbers from the standard Case Statement are indicated in brackets following the paragraph numbers that follow.

237.    **[1] State whether the alleged unlawful conduct is in violation of 18 U. S. C. § 1962(a), (b), (c), and/or (d).**

The unlawful conduct is in violation of 18 U. S. C. § 1962(a), (b), (c), and (d), in general terms as follows:

a.    The Finova defendants violated section (a) because they operated the enterprise described below in a manner designed to commit bank fraud in order to invest money derived from the bank fraud in the enterprise. Specifically, Finova wanted to expand its Thaxton-related operations. It anticipated being able to derive large profits from that operation and to extricate itself from the risk of loss through the sale of subordinated notes,

but in order to expand its Thaxton-related business Finova needed more money. It obtained that money by forcing the Thaxton entities to create a new legal entity – TIC – that was ostensibly independent, and Finova used this as a means of defrauding its own lenders by obtaining more money from them for investment in the Thaxton companies than Finova would have been legally able to borrow had it not been for this fraud. Thus Finova obtained money from bank fraud, involving the manipulation of the Thaxton companies involved in the enterprise, and it used the income derived from this fraud to invest in and to maintain its interest in the enterprise described below. On information and belief, based upon Finova's own insolvency, it also provided other false information to its lenders to obtain the total funds that it loaned to Thaxton and the enterprise.

b.    The Finova and, later, the Berkadia defendants violated section (b) because they used the pattern of racketerring activity described herein to acquire and maintain their interest in and control of the enterprise. Specifically but without limitation, the defendants used the bank fraud described above to acquire their increased interest in the enterprise, and also used extortionate threats to force the Thaxton entities to comply with Defendants' directives concerning the operations of the enterprise.

c.    The defendants violated § 1962(c) by participating directly and indirectly in the affairs of the enterprise through a pattern of racketeering activity, including but not limited to obtaining money to invest in the Thaxton companies through bank fraud, using extortionate means to cause the Thaxton companies to participate in the enterprise, siphoning money out of the enterprise in anticipation and contemplation of Thaxton's bankruptcy, and hiding assets in the Finova bankruptcy at the expense of the creditors of Finova;

d.      The defendants violated § 1962(d) by knowingly agreeing to participate in and facilitate the overall scheme.  While the publicly visible arms of the enterprise were, for the most part, the Thaxton companies, the control of the enterprise was in the hands of the Defendants, who dictated the shape it assumed and the actions it took, who received the profits of its operations, and who took the key steps necessary to the continued existence of the enterprise.  This included obtaining the money to fund the enterprise through bank fraud, controlling the enterprise through extortion, and siphoning off the money raised by the enterprise through bankruptcy fraud.

238.    **[2]  List all defendants and state the alleged misconduct and basis of liability of each defendant.**

The Defendants include the following:

a.      Finova Capital Corporation.  This is the corporate entity that purported to deal with the Thaxton entities.  Its misconduct, which is the basis for its liability, includes without limitation the following:

i.      Using its investment in the enterprise, acquired through bank fraud, to acquire and maintain control of the enterprise, harming the plaintiffs as set forth more fully below;

ii.     Using extortionate threats to control the enterprise.

iii.    Hiding its own assets in its bankruptcy, for the benefit of the other defendants;

iv.     Failing to disclose the existence of the plaintiffs herein as creditors of its bankruptcy, and failing to disclose its liabilities to the Thaxton companies arising from Finova's involvement in Thaxton's affairs;

v.     Fraudulent conveyance and concealment of assets of the enterprise prior to and in contemplation of the Thaxton bankruptcies.

b.     Finova Group, Inc.  This is the parent company of Finova, and as such it directed and assisted in the wrongdoing listed above.  On information and belief it was involved in the original bank fraud used to fund the establishment of the enterprise.  As the controlling person of Finova Capital, knew of and doubtless aided and abetted that entity in its activities in 1999 and 2000.  Once the companies began to head toward bankruptcy, in 2000, on information and belief they were under common control, participated and conspired with the other defendants together, and after that time Finova Group has served as the formal conduit through which control by the other defendants was exercised and through which funds from the enterprise were funneled out of Finova to the other Defendants.  The basis for its liability is its role as a controlling person and aider and abettor of Finova Capital, and its participation in the events described herein;

c.     Berkadia, LLC, together with the other Berkadia entities.  The exact role played by each of these entities is not open to public scrutiny, and plaintiffs must treat them collectively until more information is available.   These entities hold a controlling interest in Finova Group and, therefor, an indirect controlling interest in Finova Capital.  They also act as the management company for Finova.  Related individuals apparently control the board of directors.  From before the time of Finova's bankruptcy in early 2001, Berkadia appears to have been able to control Finova, and beginning at that time it had a role in Finova's decisions concerning Thaxton as well.  In fact, on information and belief, Berkadia was a corporate shell that played only a nominal, formal role, allowing Thomas Mara, possibly other individuals associated with Leucadia and Berkshire, and Leucadia and

Berkshire to actually control the affairs of Finova and Thaxton. Similarly, Berkadia served as a channel through which funds were funneled out of Thaxton, through Finova, to the other defendants. Berkadia's liability arises from its active participation in the enterprise, its role as a controlling person, and as an aider and abettor;

      d.     Berkshire Hathaway, Inc. On information and belief Berkshire shared the planning role with Leucadia in coming up with the structure whereby Berkadia would be the nominal party taking over Finova and the enterprise with Berkshire and Leucadia being the actual principals. On information and belief Berkshire purchased debt obligations of Finova prior to Finova's bankruptcy, obtaining about 13% of all of the senior debt at a discounted price in the range of 60 cents on the dollar. By funding a bankruptcy plan in which Finova paid 70 cents on the dollar to its senior debtholders, with the remainder due over time, Berkshire was able to turn an immediate profit. To maximize its profits, Berkshire conspired with Leucadia to do more than simply collect out the Finova assets; instead, they planned to earn a premium on the assets. In the case of Thaxton, this involved taking a debt that was severely impaired and having it paid down sufficiently through note sales that it would be comfortably secured, and then forcing the bankruptcy or liquidation of Thaxton. To accomplish this, defendants breached the loan agreements with Thaxton and forced it to enter into amended agreement, then breached even those agreements by forcing Thaxton to stop drawing on its line of credit by unilaterally imposing an arbitrary "reserve". Berkshire's main role was to fund all this, which it did to the tune of nearly six billion dollars. It is a safe bet that Berkshire did not invest six billion dollars without full knowledge of all details of the Finova situation, including details of the massive Thaxton loan and relationship. The basis of Berkshire's liability is its active funding and participation in the above plan.

e.    Leucadia, Inc.  This is Berkshire's partner in Berkadia, and in the entire enterprise.  According to Warren Buffett, head of Berkshire,  "We supplied the money, and Leucadia supplied the brains."  Leucadia on information and belief played a more active role in the management of the entireprise – it was "the brains".  Leucadia's liability arises from the same general facts as those described for Berkshire, above.

f.    Thomas E. Mara.  Thomas Mara is an officer of Leucadia who took one of the leading individual roles involving Berkadia in the management of Finova and the enterprise.  Mara personally came to Lancaster to meet with Thaxton when Finova and Berkadia were forcing Thaxton to consent to amended loan documents calling for the paydown of the loan instead of the extension agreed to previously by Finova.  Mara also was personally involved in making decisions for Finova before and during Finova's bankruptcy even before Berkadia had any legal right to make decisions for Finova.  Mara's liability arises from the same general facts as those stated above, from his role as an active participant in the schemes described, from his role as a control person, and from his individual actions and those he took on behalf of Finova, Berkadia, and Leucadia.

239.    **[3]  List all alleged wrongdoers, other than any defendant listed above, and state the alleged misconduct of each wrongdoer.**

Other wrongdoers include the following:

a.    James Garrett and his companies Carolinas First Financial and Carolinas First Investments, who coordinated the note sales program and participated in the planning of the note sales, including violations of banking statutes.  Garrett was also in charge of the Thaxton commercial lending division, which is significant because two hallmarks of banking activities are making commercial loans and taking deposits – both of which activities Garrett

was involved in. Garrett has been indicted and will be facing trial for his involvement in the Thaxton note sales program;

b.      The Thaxton Group, Thaxton Life Partners, and their affiliates and subsidiaries, including TIC, who were the publicly visible members of the enterprise, engaging in a legititimate business that produced large cash flows and obscured the underlying Ponzi scheme, and also selling notes to the public to pay off Finova and its cohorts before the revealing the insolvency of the Thaxton companies became unavoidable. On information and belief the Thaxton companies may have been, to some extent, reluctant participants in the enterprise whose consent to participate was obtained through extortionate means, as set forth more fully elsewhere in this statement;

c.      James Thaxton. Within the various Thaxton companies, the formal head of each was, in most cases, James Thaxton, and he was the individual officer or those entities with the greatest ability to influence their actions. When Finova took over the funding of the Thaxton companies in 1995, on information and belief it developed a relationship with James Thaxton where he looked to Finova for guidance and made business decisions in part based upon Finova's recommendations. Once Finova increased its line of credit to the Thaxton companies to $100 million, and later to $250 million, James Thaxton individually on information and belief felt constrained to cause the Thaxton companies to follow policies laid down by Finova. On information and belief, as James Thaxton began to realize the degree to which the Thaxton companies depended upon Finova's approval, because of their inability to find any other source of financing, Thaxton himself became a participant in the enterprise whose consent was only obtained through extortionate means. That is to say, James Thaxton did not want to continue selling notes and increasing the insolvency of the

Thaxton companes, but he did so because Finova insisted he do so and because of threats made to him and fear of what would happen if he did not comply with Finova's directives. Ultimately, when disclosure of Thaxton's insolvency forced the note sales program to be closed down, James Thaxton initially sought refuge out of town and hired security guards to protect the Thaxton offices, and he ultimately took his own life.

240.    **[4]  List the alleged victims and state how each victim was allegedly injured.**
The victims include the following:

      a.      The Society for Crippled Children, and each other individual plaintiff listed in the caption of this case, each of whom has lost all of the assets they invested in Thaxton notes, and whose notes are now worthless.  These note purchasers were injured because by setting up the enterprise as they did, the defendants created an association in fact of various businesses that created an enormous cash flow paying large sums out to Finova and the other defendants, but funded from the plaintiff's investments, which due to the underlying insolvency of the enterprise and as the defendants foresaw or should have foreseen, would inevitably be lost;

      b.      Other purchasers of notes from Thaxton, who have not at this time joined in this lawsuit, who were injured through the loss of their investments;

      c.      Purchasers of subordinated notes of Thaxton Life Partners, which also became a part of the enterprise;

      d.      Individual shareholders of The Thaxton Group, whose equity in the company was entirely wiped out when the company became insolvent with the acquisition of TIC; and

      e.      James Thaxton himself, who was forced by Finova to become an unwilling participant in the enterprise and who eventually took his own life as a result.

241.    **[5]   Describe in detail the pattern of racketeering activities or collection of unlawful debts alleged for each RICO claim. The description of the pattern of racketeering shall include the following information:**

      a.    **List the alleged predicate acts and the specific statutes that were allegedly violated;**

        i.    Finova committed bank fraud in violation of 18 U.S.C. § 1344 by misrepresenting the nature of the Thaxton loans and covering up the fact that the TIC and TGI loans were for all intents and purposes loans to the same entity – particularly after TIC was acquired by TGI in 1999.  By covering up this fact, Finova was able to obtain money from its lenders under false pretenses.

        ii.    As described above, the Thaxton Companies operated as *de facto* banks, although in violation of the Glass-Steagall Act, and the Defendants therefore should be considered bank holding companies.  Defendants committed bank fraud by obtaining depositors' money (belonging to the noteholders) under false pretenses by purporting to be lenders rather than disclosing their true role as bank holding companies and investors who would be second in priority of distribution to the account depositors;

        iii.    On information and belief, Finova made other false and misleading representations to its lenders and overstated its assets in order to obtain other loans that it could not have obtained otherwise.  Eventually, Finova's business practices caused its bankruptcy and the lenders were forced to accept discounted payoffs of their loans.

iv.    Finova also committed bank fraud by obtaining money held in bank accounts under false pretenses.  It accomplished this in violation, among other things, of the Glass-Steagall act, by acting as a controlling person and in effect a bank holding company by investing in Thaxton and funding Thaxton's activities acting as an unchartered bank.  By doing so, Thaxton was able to give the impression that investing in Thaxton subordinated notes was equivalent to putting money in the bank, with slightly higher interest rates, with the result that thousands of investors took their money out of actual banks savings programs to purchase Thaxton notes. Berkadia and the other defendants  aided and abetted and were controlling persons of Finova and Thaxton starting in 2001 with respect to the above crime.

v.    Finova and the Berkadia entities committed bankruptcy fraud in violation of 18 U.S.C. §§ 152 and 157 in several ways.

vi.    With respect to Thaxton, the defendants caused Thaxton to operate a "bleed-out scheme" (equivalent to a bust-out scheme but taking place more gradually), beginning in 1999, when the hopelessly insolvent Thaxton enterprise was formed with the creation of TIC and the acquisition of the Firstplus companies. From that time forward, Finova, and later Finova and Berkadia forced Thaxton to acquire more and more debt from note purchasers in anticipation of the time when Thaxton would go bankrupt, so that Finova could recover the unsecured portion of its loan at the expense of the note purchasers.  The fraud arose in part from the fact that the consideration paid by the enterprise for the note purchases consisted of subordinated notes that apparently had significant value, but in fact had limited value because of Thaxton's insolvency, and, further, were subject to rescission because of

securities violations.  Since the sales were subject to reversal because of the above reasons, Thaxton did not actually have assets to distribute to Finova and the other defendants, and by forcing Thaxton to pay those funds the defendants were concealing actual funds belonging to Thaxton and owed to the plaintiffs and other creditors;

vii.     With respect to Thaxton, Finova also committed bankruptcy fraud by causing  Thaxton to convey a security interest to Finova in connection with the leveraged buyout of the Firstplus companies, with the result that the unsecured noteholders of Modern Finance, one of the Firstplus companies, lost any possibility of recovery of their funds in full when Thaxton foreseeably went bankrupt;

viii.     Finova committed bankruptcy fraud by forcing TLP to make a fraudulent conveyance to it in the amount of $4 millon, shortly before TLP's bankruptcy;

ix.     Berkadia committed bankruptcy fraud in connection with the Finova bankruptcy by taking an active role in assisting Finova to hiding from creditors and other potential investors the plans of the defendants to change the Thaxton contracts so as to collect more from the Thaxton relationship than they were entitled to collect;

x.     Defendants committed bankruptcy fraud by failing to list Thaxton and the noteholders as creditors and to disclose claims that existed as a result of Finova's participation with Thaxton in defrauding noteholders, and of which Defendants on information and belief were fully aware;

xi.     All defendants engaged in extortion in violation of the Hobbs Act, 18 U.S.C. § 1951, and South Carolina Code § 16-17-640 by using threats and fear to

force Thaxton to assent to matters to which Thaxton would not otherwise have agreed. They accomplished this in order to obtain money and other things of value from Thaxton, including but not limited to the following:

(1)     Prior to the FirstPlus deal, Finova had Forcing Thaxton to create TIC and to purchase the Firstplus companies;

(2)     Forcing Thaxton to continue to sell subordinated notes even after it appeared that it would be impossible to pay them back;

(3)     Forcing Thaxton to agree to what was essentially a breach of contract, after Finova had agreed to extend t he loan, by requiring substantial additional concessions before Finova actually executed amended loan documents;

(4)     Forcing Thaxton to agree to what was essentially a breach of contract, in ceasing to make use of the revolving line of credit even when there was availability under the loan documents, when alternative funding (subordinated notes) cost more in interest, and during cyclical increases in business where the borrowed funds could be foreseeably repaid on a short term basis. Instead, Thaxton ended up hoarding cash so as to be able to meet its fluctuating need for funds;

(5)     Forcing Thaxton management to retain non-performing assets in order to avoid writing off goodwill that would in turn prevent continuing note sales demanded by Finova;

(6)    Forcing Thaxton management to concentrate their main efforts on note sales, rather than on matters that would have resulted in the better functioning of the Thaxton companies.

(7)    The reality of the threat to Jim Thaxton is illustrated by the fact that when the note program was frozen, he felt it necessary to move from his home in Pageland, South Carolina, to stay in an undisclosed location near Charlotte, NC, to hire security guards to deny entry to the Thaxton headquarters to persons without business there, and, tragically, by the fact that the failure of the companies at the expense of the noteholders led to Jim Thaxton's suicide.

b.    **Provide the date of each predicate act, the participants in each predicate act, and a description of the facts constituting each predicate act;**

See discussion above.

c.    **If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, or fraud in the sale of securities, the "circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Identify the time, place, and contents of the alleged misrepresentations, and the identity of persons to whom and by whom the alleged misrepresentations were made;**

Not applicable.

d.    **State whether there has been a criminal conviction for violation of any predicate act;**

Not yet.  James Garrett has been indicted by the South Carolina State Grand jury. Other investigations, on information and belief, are continuing.

e.    **State whether civil litigation has resulted in a judgment with regard to any predicate act;**

In the bankruptcy adversary proceeding in the Thaxton Group bankruptcy in Delaware (as to which the reference was withdrawn and the case referred to South Carolina for pretrial proceedings pursuant to the order of the MDL Panel), summary judgment has been entered against Finova Capital based, in part, on its violation of the banking laws.  That judgment is presently on appeal.

In related litigation, other individual plaintiffs have a trial against Finova that is scheduled to begin in August, 2006.

Two settlements of related claims by the class of all Thaxton noteholders have been preliminarily approved and final approval is anticipated shortly, which will result in a court order approving the settlement.  The terms of the settlements do not call for any admission of liability on the part of the defendants, Thaxton's lawyers and accountants.

f.    **Describe how the predicate acts form a "pattern of racketeering activity"; and**

The predicate acts form a pattern because they are part of an overall scheme where Finova, and later Finova and Berkadia, sought to enrich themselves at the expense of third parties.  They involved the use of the same means over a period of about four years, with the same method of commission, and affected thousands of note purchasers, including the many involved in the present case.  As described above, the enterprise was similar to a Ponzi

scheme or a "bust-out" or "bleed-out" scheme where the perpetrators first infused money into an apparently legitimate business for the purpose of drawing in unsuspecting investors, then flowing the investment money out to the original perpetrators before bankrupting the company and leaving the investors holding the bag. Finova committed bank fraud to bring in the initial money, extortion to force Thaxton to comply, and bankruptcy fraud to pull out its profits before the enterprise as a whole slid into its inevitable bankruptcy.

g.    **State whether the alleged predicate acts relate to each other as part of a common plan. If so, describe the alleged relationship and common plan in detail.**

The predicated acts are part of a common plan, as described above. The plan was modified, however, when the Berkadia defendants became involved, because after that time Finova's plans to liquidate Thaxton were accelerated.

242.    [6]    **Describe in detail the alleged "enterprise" for each RICO claim. A description of the enterprise shall include the following: (a) the names of the individuals, partnerships, corporations, associations, or other legal entities which allegedly constitute the enterprise; (b) a description of the structure, purpose, function, and course of conduct of the enterprise; (c) a statement of whether any defendant is an employee, officer, or director of the alleged enterprise; (d) a statement of whether any defendant is associated with the alleged enterprise; (e) a statement of whether plaintiff is alleging that any defendant is an individual or entity separate from the alleged enterprise or that any defendant is the enterprise itself, or a member of the enterprise; (f) if any defendant is alleged to be the enterprise itself, or a member of the enterprise, an explanation of whether such defendant is a perpetrator, a passive instrument, or a victim of the alleged racketeering activity.**

The enterprise consisted of a group of individuals and businesses involved in putting together and operating a financial scheme similar to a pyramid club or Ponzi scheme, for the profit of certain members of the enterprise and at the expense of thousands of members of the general public, including the plaintiffs in this case. Like any Ponzi scheme, there was an apparently legitimate business, and the existence of a purportedly profitable business supported the solicitations of investments from the public. This arrangement resulted in enormous cash flow, which enabled the enterprise to continue soliciting investment from the public, and also allowed the initial investors in the enterprise to pull out their money together with substantial profits while operations continued. The source of repayment of the initial investments and profits was not the profits of the business, but rather the new investments made by unsuspecting members of the public. Because the business operations were insolvent from the start, there was never any realistic chance the business could become profitable in order to repay its debt; instead, its ongoing operations served only to present a facade of profitability before its inevitable collapse, to all the initial investors to recoup their investments and profits.

> **a.**    **the names of the individuals, partnerships, corporations, associations, or other legal entities which allegedly constitute the enterprise;**

The entities constituting the enterprise fall into several categories, in light of the general overview set forth above:

> **i.**    **The Core Businesses** – The scheme was characterized by a core business that provided an air of legitimacy to the scheme as a whole, and also provided the massive cash flow that enabled the scheme to continue for several years before the insolvency of the businesses became apparent. Although the core businesses took various legal forms over the years, their subservience to the

enterprise resulted in the businesses being operated as a *de facto* joint enterprise with common control and a common purpose. The core businesses include the following:

   (1)   *The Thaxton Group, Inc.*, with various subsidiaries, operating consumer loan and insurance companies, among other things. Individual subsidiaries included the following:

   Thaxton Operating Company

   TICO Premium Finance Company, Inc.

   Thaxton Insurance Group, Inc.

   Thaxton Commercial Lending

   Paragon, Inc.

   Eagle Premium Finance Company, Inc.

   Modern Central Recovery

   Thaxton Investment Corporation

   Southern Management Corporation

   Southern Financial Management

   Southern Finance of South Carolina

   Quick Credit Corporation, Inc.

   Southern Finance of Tennessee, Inc.

   Covington Credit of Texas, Inc.

   Covington Credit, Inc.

   Covington Credit of Georgia, Inc.

   Covington Credit of Louisiana, Inc.

   SoCo Reinsurance, Ltd.

TICO Credit Corporation

TICO Credit Company, Inc.

TICO Credit Company of North Carolina, Inc.

TICO Credit Company of Alabama, Inc.

TICO Credit Company of Georgia, Inc.

TICO Credit Company of Virginia, Inc.

TICO Credit Company (Delaware)

TICO Credit Company of Tennessee, Inc.

TICO Credit Company of (Tennessee)

TICO Credit Company of Mississippi, Inc.

TICO Credit Company (Mississippi)

Modern Finance d/b/a TICO Credit Company

Modern Financial Services, Inc.

TICO Reinsurance, Ltd.

Fitch National Reinsurance, Ltd.

Thaxton Securities, Inc.

(2)    *TIC (or Thaxton Investment Company).*  An ostensibly independent company paralleling Thaxton's operations, formed in early 1999, and merged into Thaxton toward the end of the year.

(3)    *Thaxton Life Partners, Inc. and its subsidiaries.*  Thaxton Group had established a high-risk insurance division known as Thaxton RBE. In 2000, because losses interfered with the sale of notes, Finova and Thaxton spun this off into an independent company, Thaxton Life

Partners, Inc. Thaxton took care of day to day management of TLP, and Finova funded the new company with a $10 million payment, characterized as a loan, but which Finova immediately wrote off, since TLP had no assets or income with which to repay the loan. (However, sales of subordinated notes enabled Finova to recoup this loan prior to TLP's bankruptcy.) Subsidiaries of Thaxton Life Partners include:

Thaxton RBE, Inc.

Thaxton Reinsurance Ltd.

Thaxton Insurance Group of Arizona, Inc.

Claims Management Services, Inc.

U.S. Financial Group Agency, Inc.

Thaxton Insurance Group of Nevada, Inc

Thaxton Insurance Group of New Mexico, Inc.

Oasis Insurance Agency, Inc.

Summerlin Insurance Agency, Inc.

Despite this long list of "Core Businesses", it is important to note that the operations of these businesses were largely unified because they all operated with the same officers and directors in charge, through the same offices and infrastructure, the same administrative staff, and with the same control exerted by other defendants. To a large extent, corporate distinctions were almost completely ignored except insofar as the companies were grouped into divisions relating to territorial management and

lines of business – which groupings did not necessarily correspond to the classification of subsidiary companies described above.

   ii. **Associated Individuals**.  As alleged in the complaint, ultimate control over the Thaxton companies lay in the hands of Finova and other defendants, who had and exercised the power to determine the overall direction taken by the companies, including such matters as the decision to acquire new businesses and expand the business, the puffing up of equity by allowing Thaxton to characterize a portion of its debt to Finova as : "equity", the decision to sell massive amounts of notes to pay down Finova, and numerous other general policy decisions.   Looking only at the legal entities comprising the Thaxton companies, officers and agents who participated in some manner in the enterprise included the following:

   *Charles E. Brooks, "Esq."* – a disbarred attorney who served as in-house counsel for the Thaxton companies;

   *James Garrett* – an employee of Thaxton and also a purportedly independent broker who laid out the plans for the note sales, who has since been indicted for fraud and conspiracy;

   *Allan Ross* – Thaxton's CFO, who was either hopelessly incompetent or knew of Thaxton's underlying insolvency and worked to cover it up;

   *Robert Wilson* – Thaxton's Chief Operating Officer, who was more concerned with the business operations of Thaxton;

   *James Thaxton* – Titular head of the Thaxton companies.  Initially, Thaxton ran the companies independently, as the majority stockholder and the one with most expertise and experience in the companies' original business,

insurance.  As Finova increased its domination, and particularly after the other defendants became involved, Thaxton continued to run the day to day operations of the Thaxton Companies but in fact the Defendants made the key decisions whereby the Thaxton Companies were forced to participate in the enterprise.

iii.     **Other businesses**.  In order to mount the massive note sales program required by the Finova financing plan, the core businesses associated with other companies to accomplish the ends of the enterprise.  These other companies include:

(1)     *Carolinas First Investments.*   A pseudo-independent brokerage company that was essentially given to James Garrett by Thaxton Group to provide a purportedly independent broker to sell Thaxton notes in certain states, to coordinate and supervise the sale of notes in all states, and to handle the sales of notes to be placed into IRA's and other special accounts;

(2)     *Carolinas First Financial*.  Another company operated by James Garrett, whose function remains unclear, but whose name was associated from time to time with Thaxton note sales and which appears to have been a conduit for payment of funds to Garrett.

(3)     *Sterling Trust Company*.  This is a Texas based trust company specializing in serving as custodian for self-directed IRA's, 401-k's, and similar investment vehicles.  Theoretically, investors were supposed to pick out their own investments, but the way it worked with Thaxton notes was that most investors were given the

impression they were using Thaxton to "purchase" an IRA in the same way one would go to a bank to establish and IRA. The paperwork did not make clear that in fact the Sterling account would end up purchasing Thaxton notes, because the paperwork provided for the appointment of James Garrett as the agent controlling the investment, so that Garrett then executed paperwork after the fact and the investors in many cases never saw that the end result was that Sterling at the direction of Garrett purchased Thaxton notes in the names of the Thaxton investors. It is not clear at this point whether or not Sterling was willing participant in the enterprise or whether it was simply carrying out its contractual duties with the individual investors.

Together, the Core Businesses, the Associated Individuals mentioned above, and the Other businesses are referred to in general as the "Thaxton Companies" for purposes of this section of the Complaint, because they were all involved in the general business function of the enterprise, that is, carrying on an apparently legitimate business that generated massive cash flow that masked the underlying insolvency of the businesses, and selling notes to the public for the purpose of funneling the funds through to the defendants.

iv.    The Finova Companies. Finova itself was a conglomerate consisting of numerous subsidiaries. On information and belief the only companies in the Finova Group relevant to the present case are the Finova Group, Inc., and Finova Capital Corporation, a subsidiary of Finova Group. Finova Capital Corporation was the company that had direct dealings with the Thaxton Companies, thus creating the

enterprise, and on information and belief Finova Group was instrumental in providing funding and management of Finova Capital, including but not limited to obtaining the money to invest in TIC through bank fraud.  Individuals working as agents, officers and employees of the Finova Companies are too numerous to enumerate here, but some who were most closely involved in the enterprise include the following:

        (a)    Cash Rohrbaugh

        (b)    Steve Cammack

        (c)    John Burtschaell

        (d)    Tony Hawkins

      v.    *The Berkadia Companies.*  In 2000, as Finova's over-leveraged position became impossible to hide from the investing public, on information and belief Berkshire Hathaway and Leucadia independently began to explore the possibility of becoming involved with Finova.  Eventually the two agreed to work together and formed Berkadia,LLC, and as a result various companies and individuals took over control of Finova in 2001 and also took over control of the enterprise, acting to tighten up control over the Thaxton Companies and accellerating the pace of collections, thus forcing an increased emphasis on note sales.  The Berkadia Companies include the following:

        (1)    Berkadia, LLC.  Apparently this is a shell corporation that does little, if anything other than serving as a conduit for money and control;

(2)    Berkadia II LLC.  Plaintiffs do not yet know the function of this company, which may be a dormant company formed for another project;

(3)    Berkadia Equity Holdings LLC. Plaintiffs are unsure of the precise role played by this company, but on information and belief it served as a conduit for some of the profits gained by other defendants, or as an entity formed for tax reasons in connection with the financial transactions arising from the Finova deal;

(4)    Berkadia Managment LLC.  Plaintiffs are unsure of the precise role played by this company, but on information and belief this is a management company involved in directing the affairs of Finova and, thereby, the enterprise.

In addition, there were of course numerous agents, officers and employees of the Berkadia Companies involved in the enterprise.  On information and belief, the following were involved in varying degrees in directing the enterprise:

(5)    Thomas Mara.  Mara

b.    **a description of the structure, purpose, function, and course of conduct of the enterprise;**

As described more fully above, the enterprise was structured to contain a group of apparently legitimate businesses – the Thaxton companies, controlled at first by Finova and later by Finova acting on behalf of the other defendants.  The purpose of the enterprise was to create massive cash flow that would profit Finova.  It functioned by using the apparently successful operations of the Thaxton

Companies to attract investments, even though those investments were, at bottom, relatively worthless in light of the insolvency of the businesses. The course of conduct of the enterprise was the running of an ordinary business by Thaxton, coupled with an aggressive note program to generate funds for defendants. The note program was made possible through misrepresentations made or facilitated by the defendants.

c.     **a statement of whether any defendant is an employee, officer, or director of the alleged enterprise;**

Because the enterprise was an association-in-fact without any formal legal charter, it did not have officers, directors, or employees;

d.     **a statement of whether any defendant is associated with the alleged enterprise;**

Each defendant was associated with the enterprise as described above;

e.     **a statement of whether plaintiff is alleging that any defendant is an individual or entity separate from the alleged enterprise or that any defendant is the enterprise itself, or a member of the enterprise;**

No defendant is the enterprise itself, and each defendant is a person or entity separate from the enterprise iteself, but all defendants acted as participants in and members of the enterprise;

f.     **if any defendant is alleged to be the enterprise itself, or a member of the enterprise, an explanation of whether such defendant is a perpetrator, a passive instrument, or a victim of the alleged racketeering activity.**

Each of the defendants was separate from the enterprise, but acted as a member of it, and each defendant was a perpetrator and participant in the enterprise's acts

243.     [7] **State and describe in detail whether plaintiff is alleging that the pattern of racketeering activity and the enterprise are separate or have merged into one entity.**

The pattern of racketeering activity and the enterprise remain separate, because the enterprise itself includes various Thaxton companies that were engaged in lawful business. Thus the purpose of the enterprise was not simply to engage in racketeering activities, but rather to subvert the lawful activities of Thaxton through the pattern of racketeering activities in order to increase the profits of the Defendants.

244.     **[8] Describe the alleged relationship between the activities of the enterprise and the pattern of racketeering activity. Discuss how the racketeering activity differs from the usual daily activities of the enterprise, if at all.**

The usual daily activities of the enterprise consisted of two elements. The first was the carrying on of the ordinary, legal business of the Thaxton companies, making loans and selling insurance. This is where Jim Thaxton's expertise lay and where he devoted his main energies running the companies. The second daily activity was the note sales that became more and more a central focus of the companies as the defendants pressured Jim Thaxton to do so. The enterprise had little to do with the first of these elements, except to the extent it required massive cash flow for the rest of the scheme to work. The goal of the enterprise was to bring in money through the second element, for payment to Finova and the other defendants. The pattern of racketeering activities was designed to cause this payout to Finova, by, first, obtaining the initial seed money through bank

fraud, forcing Thaxton to shape its activities through extortion, and transferring the money to defendants through bankruptcy fraud.

245.   **[9]  Describe what benefits, if any, the alleged enterprise receives from the alleged pattern of racketeering**.

Money.  The defendants received the benefits of the enterprise, in the form of paydown of the Finova debt and enhanced profits that would have been otherwise unavailable.

246.   **[10] Describe the effect of the activities of the enterprise on interstate or foreign commerce.**

Each defendant and each of the principal companies in the enterprise engaged in business in interstate commerce.  The defendants all are located outside of South Carolina, and engaged in running the enterprise within South Carolina.  Thaxton itself operated the enterprise in a multi-state area, and sold notes to persons in many different states, although the note sales were technically qall completed in Lancaster, South Carolina when the "offers to purchase" were accepted by endorsement.

247.   **[11]  If the complaint alleges a violation of 18 U. S. C. § 1962(a):**

a.      **State who received the income derived from the pattern of racketeering activity or through the collection of unlawful debt; and**

By making false and misleading reports to its lenders, on information and belief, Finova was able to obtain money for lending out to third parties.  On information and belief both Finova Group and Finova Capital would have been involved in making false statements to their lenders.

b.      **Describe the use or investment of such income.**

The income was used to provide 100% funding for the acquisition of four consumer loan companies owned by FirstPlus, which Finova directed be held by a new company, entirely financed by Finova, known as TIC and ostensibly owned by James Thaxton, but controlled by Finova and with all of the income of the company ultimately flowing to Finova. TIC was quickly merged with Thaxton Group to enable the sales of notes to be maximized, and together the two groups of companies comprised the chief money generating arm of the enterprise.

248.    **[12]  If the complaint alleges a violation of 18 U. S. C. § 1962(b), describe in detail the acquisition or maintenance of any interest in or control of the alleged enterprise.**

a.    In order to acquire its initial stake in the enterprise, Finova needed money to fund the FirstPlus purchase. On information and belief, in order to fund such a purchase, even if it happened to have sufficient cash on hand, Finova needed to make reports to its banks indicating that its use of funds was in compliance with their lending limitations, including a cap on total loans to any single customer. Only by committing bank fraud, on information and belief, was Finova able to extend a line of credit of $150 million to the enterprise, to be added to the existing line of credit of $100 million, thus creating and acquiring an interest in the enterprise. In the words of Steve Cammack, head of the Finova rediscount division, the FirstPlus acquisition through Thaxton was an "indirect acquisition."

b.    Finova and, later, Berkadia maintained their interest in and control of the enterprise by using extortionate threats.

249.    **[13]  If the complaint alleges a violation of 18 U. S. C. § 1962(c)**

a.    **State who is employed by or associated with the alleged enterprise; and**

As Warren Buffet described the matter, *"We supplied the money, and Leucadia supplied the brains*." The enterprise never existed as an individual or as a formally organized business entity. Rather it was an association in fact of various people and businesses. The "operational" arm of the enterprise – that raised the money, handled it, and paid it out to defendants, consisted of the various Thaxton business entities and associated businesses and people. The up front funding and direction was initially provided by Finova Capital and Finova Group, and later the Berkadia entities – Berkadia LLC and its affiliates, and Leucadia, Berkshire Hathaway, and Thomas Mara – bought their way into Finova and took over management of the Thaxton relationship, accelerating the focus on sale of notes and the payout of money to Finova.

b.    **State whether the same entity is both the liable "person" and the "enterprise" under § 1962(c).**

The same entity is not both the liable person and the enterprise. The liable persons are the Finova entities and the Berkadia entities, whose association with the enterprise was to fund it and control it, using the various Thaxton companies as the operative entities that handled the day to day business of the enterprise, consisting of generating and reporting substantial cash flow and utilizing this to pay money to Finova and, indirectly, to the other defendants, out of the money raised from the noteholders, including plaintiffs.

CrippledChildren-v-BerkshireHath-Cpl

250.    **[14]  If the complaint alleges a violation of 18 U. S. C. § 1962(d), describe in detail the facts showing the existence of the alleged conspiracy.**

As set forth in detail above, the enterprise required the coordination of numerous legitimate companies under the direction and control of Finova and the other defendants.  The success of the enterprise was dependant on all of the members acting in concert – both the Thaxton companies and the various defendants.  From the beginning, Finova was fully aware of the insolvency of Thaxton and the nature of the note sales program, and took numerous affirmative steps to encourage and to facilitate the note sales.  The entity could not have been funded without Finova's bank fraud, made possible by the coerced cooperation of TIC, formed at Finova's behest.  Note sales were made possible by Finova's collusion in the fake equity scheme.  Finova cooperated with Thaxton in moving entities out of Thaxton, and even funding the spin off of TRE in order to facilitate note sales.  Finova represented to Ohio regulators that it had extended the Thaxton note; again, to facilitate note sales.  When the other defendants became involved, they required Finova's collusion to effectuate their own schemes, as described above.

251.    **[15]  Describe the alleged injury to business or property.**

In each instance, each plaintiff was injured by the loss of the plaintiffs' investment and the Thaxton subordinated note becoming worthless.  Total damages for all plaintiffs, including interim interest up to the date of Thaxton's bankruptcy and prejudgment interest thereafter is in the range of $84 million.

252.    **[16]  Describe the direct causal relationship between the alleged injury and the violation of the RICO statute.**

Prior to being dragged into the enterprise by Finova, Thaxton was a medium-sized insurance and loan company that had a modest amount of equity derived from retained earnings and outside investments, and that had been profitable at times and was capable of operating profitably.  By committing bank fraud, Finova tripled the size of the Thaxton companies, and caused them to become part of the enterprise and the front for a massive Ponzi scheme.  The whole purpose of the enterprise from that point on was to sell notes for payment to Finova and the other defendants before Thaxton's insolvency caused the whole scheme to fall into bankruptcy.  Thus the injuries to the plaintiffs were a natural and intended result of the entire illegal enterprise.

253.    **[17]  List the damages sustained by reason of the violation of 18 U. S. C. § 1962, indicating the amount for which each defendant is allegedly liable.**

Approximately $84,000,000.00, the amount invested in notes by the Plaintiffs, together with interest.  Each defendant is liable for the entire amount.  Plaintiffs are also entitled to treble damages, reasonable attorneys' fees, and costs of this action.

254.    **[18]  List all other federal causes of action, if any, and provide the relevant statute numbers**.

Plaintiffs have also brought claims arising from statutory violations of Section 11 of the Securities Act of 1933, 18 U.S.C. § 77(k), including control person liability pursuant to 18 U.S.C. § 77(o).  These claims arise from misstatements of material fact in the registration statement, and since they do not require proof of *scienter* or reliance they do not sound in fraud.

255.  **[19]  List all state claims in the case pursuant to supplemental jurisdiction, if any**.

Plaintiffs have asserted claims for civil conspiracy and  unfair trade practices under South Carolina State Law.

256.  **[20]  Provide a brief outline of any additional information that you feel would be helpful to the court in processing your RICO claims.**

There is evidence suggesting that Defendants actively participated in defrauding the Plaintiffs, including committing securities fraud.  There is also evidence suggesting that at certain times defendants were control persons with respect to commission of securities fraud by the Thaxton entities.  With respect to the RICO claims set forth in this complaint, plaintiffs are not relying on any of the above evidence, and with respect to violation of securities laws plaintiffs are relying on statutory violations that do not sound in fraud and do not require proof of scienter or individualized reliance.  Based on the foregoing, on information and belief, the PSLRA does not set forth any limitations on this action with respect to the RICO claims.

## FOR A FOURTH FIRST CAUSE OF ACTION, AS TO ALL DEFENDANTS

### *(Civil Conspiracy)*

The allegations of the preceding paragraphs are realleged as if incorporated herein verbatim.

257.  Acting together, the defendants combined with Thaxton for the purpose of injuring each plaintiff by selling worthless securities to the plaintiffs with the purpose of transferring the money to Finova for the benefit of Finova Capital Corporation and the other defendants at the expense of the loss of the investment money by the plaintiffs.

258.    The numerous acts of the conspiracy are described in the earlier portion of the complaint, but include without limitation the following:

a.    The inflated equity resulting from Finova's allowing Thaxton to characterize debt as equity on its books, and providing documentation used to accomplish that end;

b.    The formation of the Thaxton Companies to acquire the FirstPlus companies;

c.    Funding the spin-off of RBE into TLC so that both could sell more notes;

d.    Operating the enterprise so that Finova and the other defendants could get the profits from the note sales, as set forth more fully above.

259.    Had all of the defendants and other, non-party conspirators not worked together, Thaxton could not have sold the notes.

260.    Each of the plaintiffs has suffered individual, special damages by the loss of their investment money and also loss of access to their investment money, including not just the loss of the interest and principal, but damages in excess of those that would be paid back as contract or restitutionary damages.

261.    The foregoing constitutes civil conspiracy, and each defendant is jointly and severally liable to the plaintiffs for the resulting damages, in the range of many millions of dollars, together with costs, reasonable attorney's fees and punitive damages.


**WHEREFORE,** having set forth their complaint in full, Plaintiffs pray as follows:

a.    For actual damages as set forth above, in an amount in the range of $84,000,000.00, including interim and prejudgment interest;

b.    Alternatively for recessionary damages in an amount in the range of $84,000,000.00, including interim and prejudgment interest;

c.      For punitive damages in an amount to be determined by the trier of fact, calculated based on the assets and operations of the defendants – purely by way of example and without limiting Plaintiffs' rights to ask for a greater award, a jury could take note of the fact that ten percent of the net earnings for Berkshire Hathaway and Leucadia for the previous year was about $1,000,000,000.00;

d.      By statute, for Treble Damages pursuant to the RICO statute, in the range of $252,000,000.00.

e.      By statute, for Treble Damages pursuant to the SC Unfair Practices Act, in the approximate range of $252,000,000.00.

f.      By statute, for reasonable attorneys fees and costs of this action; calculated as a percentage of total recovery, perhaps in the range of $473,000,000.00.

g.      In summary, a total recovery as set forth above in the range of $2,000,000,000.00;

h.      For all of the above damages to be assessed from each defendant, jointly and severally; and

i.      For such other relief as is just and proper.


PLAINTIFFS DEMAND TRIAL BY JURY.

Gilbert Scott Bagnell #5768
Randall M. Eason
BAGNELL & EASON, LLC
PO Box 2347
Lancaster, 29721
803-286-5055; Fax 286-7824

Chad McGowan
S. Randall Hood
MCGOWAN & HOOD
125 Hampton Street, Suite 101
Rock Hill, SC 29730
803-327-7800; Fax 803-328-5656
**Attorneys for Plaintiffs**

Lancaster, SC
June 8, 2006